PETTIGREW, J.
|aThe defendant, Essence Dyson, was charged by grand jury indictment with second degree murder (count one), a violation of La. R.S. 14:30.1, and attempted second degree murder (count two), a violation of La. R.S. 14:30.1 and La. R.S. 14:27. The defendant pled .not guilty on both counts. After a trial by jury, she was found guilty as charged on count one, and guilty of the responsive offense of aggravated battery, a violation of La. R.S. 14:34, on count two.[1] The trial court denied the defendant’s motion for postverdict judgment of acquittal and motion for new trial. She was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, and to ten years imprisonment at hard labor on count two, to be served concurrently.[2] The defendant now appeals, assigning error to the trial court’s denial of her motion for postverdict judgment of acquittal based on insufficiency of the evidence, and to the trial court’s denial of her motion for new trial based on the verdict being contrary to the law and evidence and the ends of justice. For the following reasons, we find the record sufficiently supports the jury’s verdict and affirm the defendant’s convictions and sentences.
STATEMENT OF FACTS
A review of the record and evidence presented at trial reveals the following. During the early morning hours of June 30, 2012, officers of the Baton Rouge Police Department (BRPD) received a computer-aided dispatch (cad) reporting the detection of multiple gunshots fired at approximately 2:27 a,m., at 3006 College Drive. The cad report was consistent with the report of another officer in the same area at the same time that | she had heard four to five shots fired. The dispatch also reported that there was a white Grand Prix in which a passenger had been shot, at one of the locations of dispatch.[3]
*224 Upon arriving at the location of the victims’ vehicle behind Iberia Bank, at the Perkins Road and Acadian Thruway intersection, BRPD Corporal Aleesha Kuhn photographed a white Grand Prix into which shots had been fired. It was. later determined that the front seat passenger, victim Jordan Key, had been fatally shot in the head, and the driver, Darius Vicks, was shot in the foot.[4] Corporal Kuhn’s photographs depicted the decedent on the front passenger seat as he was found, and .then again, after he had been removed from the vehicle by the coroner’s office. Her photographs also revealed blood on the seats and throughout the interior of the vehicle, and on the exterior of the front passenger’s and driver’s doors. In addition to taking photographs, Corporal Kuhn also seized items found inside the vehicle, including a bandana, a backpack containing ski masks, a t-shirt, and a hat, a cell phone retrieved by the coroner from the pockets of the decedent, and a loaded revolver that was located in the trunk.
After securing and photographing the first crime scene, which Corporal Kuhn testified took “a couple of hours,” she then proceeded to the second crime scene reported at Rabey St. and Bennington, crossed by College Drive, which already had been secured by other responding officers. She photographed the overall scene, depicting an International House of Pancakes (IHOP), Walmart, and Albertson’s, and also specific close-up areas of the scene that had been marked by the officers where shell casings hadpbeen located. She then proceeded to the third crime scene reported—the dead end of Rabey St.— where it runs into Balis and where the suspects’ vehicle had been abandoned. When Corporal Kuhn arrived at the third crime scene, it had been secured and roped off by other officers still present at the scene. She . photographed the interior and exterior of the suspects’ vehicle, a gray Toyota Camry, including a photo of a weapon found on the floorboard of the driver’s side, a baseball cap on the ground outside the Camry, a cell phone that was on top of the Camry, as well as the surrounding area, to depict the general location.
Cory Champagne, a security guard who had just left work on Bennington Drive “about 2:30” a.m., and travelled on Rabey Street to pick up his. girlfriend from 'Wal-mart on College Drive, witnessed the crime as the events unfolded. He reported the following events that occurred around the time of the shooting. After picking up his girlfriend, he turned back onto Rabey Street and entered the left turning lane to head back toward the interstate. While waiting at the traffic light, Champagne observed a black male, over' six' feet tall, exit the passenger side of the vehicle immediately behind his vehicle. Champagne continued to watch the individual, reveal-' ing' that he was alarmed because they were in the middle of the street when the individual 'abruptly exited the .vehicle. Champagne .noted that the individual was wearing a white t-shirt, dark shorts, blue boxers, white tennis shoes, and a white bandana or headband. The individual be *225 gan walking away from the cars as though he was going to an IHOP restaurant, located in front of Walmart on College Drive. He then abruptly turned back towards the vehicles, walked straight to the vehicle in front of Champagne’s vehicle, pulled out a pistol 'and fired three shots into the vehicle. Champagne placed his car in park, drew his weapon, and ordered the individual to stop and drop his firearm. The shooter ran toward the vehicle that he previously exited, a Toyota Camry, which was travelling rapidly in reverse away | ¿from the scene of the shooting ahd was occupied by the driver and a third occupant, both also black males.[5]
At approximately the same timé, Lieutenant Cedric Muse of the East Baton Rouge Parish Sheriffs Office, the' Walmart security officer on duty at the time of the incident, had been outside in his vehicle when the gunshots were fired. After hearing the gunshots, Lieutenant Muse observed a black male running down Rabey Street toward a Camry that was travelling in reverse. Lieutenant Muse positioned his unit in front of the Camry as the black male on foot reentered the vehicle, which continued travelling in reverse in an attempt to flee from the scene. After approaching a dead end at the Rabey Street and Balis Street intersection, the occupants exited the vehicle and fled on foot. Lieutenant Muse pursued them in a foot chase until they approached a wooded area. Lieutenant Muse advised BRPD of the direction in which the individuals fled and returned to the suspects’ abandoned vehicle, where he was met by Champagne, who relayed to him what he had observed.
Champagne pointed out to Lieutenant Muse a firearm he had seen in plain view on the floorboard in the back of the suspects’ vehicle behind the driver’s seat.[6] Lieutenant Muse indicated that the firearm appeared to be jammed at the time, and he also observed and took possession of two cell phones also in plain view. Lieutenant Muse ran the license plate number of the Camry and determined that it was registered to Cierra Henry.[7] Noting that the vehicle was only occupied by males that night, Lieutenant Muse entered Henry’s name into a police database, which provided him with the name of her boyfriend, Michael Francois. Lieutenant Muse remained with the vehicle until BRPD officers arrived at the scene.
| ^Detective Sherri Harris, of the BRPD homicide division, was one of the investigating officers who responded to the dispatch and went to all three reported crime scenes. She assisted Corporal Kuhn process the vehicles and collect evidence. She testified that in response to the crime scene where the getaway vehicle (the Camry) was located, abandoned at Rabey Street, Corporal Kuhn took photographs of the Camry and of the evidence from which Harris took DNA samples and collected, including an orange and red baseball cap *226 located on the ground just outside of the vehicle, a cell phone on the passenger seat of the vehicle, another cell phone that was on top of the Camry, and a firearm that was behind the driver’s seat on the floorboard.[8] The vehicle was then towed away for further processing. When Detective Harris arrived at the second crime scene, where the shooting took place, she found the area already had been secured and evidence (shell casings) marked, so she proceeded to the Victim’s Crime Unit (VCU) office where she took statements from Champagne and Francois.
Francois ultimately admitted to being the driver of the getaway vehicle at the time of the shooting.. He identified a co-perpetrator by his nickname, “Chad Youn-gin,” whom he stated was the shooter. He stated that he did not know the true name of the co-perpetrator, but referred the police to a video entitled “Mista I’m Grown Music Video,” featuring the co-perpetrator; and'he also made an identification of “Chad Youngin” through a photographic lineup using still shots from the video.[9] Francois indicated that he did not know the other individual who was in the vehicle. After Francois’s interview, he was placed under arrest and charged with first degree murder. 17Petective Harris then contacted police informants and determined that the true identity of “Chad Youngin” was Chattley Chesterfield. She obtained a warrant for Chesterfield’s arrest. However, the police were unable to locate Chesterfield until approximately three months later, as detailed later herein.
Detective Harris also interviewed the surviving victim, Darius Vicks, when he went to the VCU office the day after the shooting, when he was discharged from the hospital. Vicks indicated that immediately after the shooting, he tossed a firearm from the vehicle that he knew had been in the deceased victim’s possession at the time of the shooting.[10] According to Detective Harris, Vicks was unable to provide any more information, stating that he had been just sitting at a red light when suddenly they were feed upon. Later, Detective Harris contacted Vicks and told him the police had two suspects pertaining to the shooting. When Detective Harris revealed that Chesterfield was ,one of the suspects, Vicks stated he was familiar with Chesterfield and then realized he had more information “that he didn’t know if it was helpful, but thought it may have a connection.” He recalled and told Detective Harris about having an odd encounter at, the Walmart, just prior to the shooting, with Essence Dyson (defendant herein), whom he knew to be Chesterfield’s girlfriend. He relayed to Detective Harris that he and the deceased had been in the Wal-mart and upon exiting the store, he saw the defendant just standing outside of the Walmart. He stated .that he asked if she *227 needed a ride, and she told him, no, that she was just waiting for her sister. Vicks suggested that the police may want to look into her, and he also provided the police with the defendant’s phone number.
Detective Harris obtained a search warrant on the cell phones obtained from the suspects’ Camry. Cell phone records revealed that minutes before the shooting, one of those cell phones had received a call from the number that Vicks provided the detectives with as being the defendant’s telephone number. On July 18, 2012, Detective Harris |8conducted an interview of the defendant.[11] After being advised of her Miranda[12] rights and executing a waiver of rights form, the defendant admitted to being at the Walmart and talking to the victims just before the shooting. She stated that she, along with someone else, went into the Walmart. Defendant said she then went outside to wait for her companion to exit the store, and she had a brief encounter with the victims as they exited Wal-mart before they headed to their vehicle. She stated that her companion then exited Walmart and together they got back into the vehicle they arrived in and left Wal-mart and headed toward the IHOP. She indicated that she was in the vehicle located behind the victims’ vehicle at the time of the shooting. She stated that the area was well lit and that she saw the shooter’s face clearly, but claimed she did not know him. She described him as a five-feet-eight-or-nine-inch male wearing a white t-shirt and a brown hat, with a mole or “mark of Buddha” and sideburns.[13] The defendant also confirmed the identity of Chesterfield as one of the passengers in the Camry, and stated she had known him since grade school.
On September 14, 2012, approximately three months after the warrant was obtained for his arrest, Chesterfield was located, apprehended, and interviewed by the police. During a five-part interview. Chesterfield, at the onset, provided inconsistent scenarios. He admitted to being at the scene of the shooting, but originally indicated that he was in the vehicle with the defendant, He initially denied knowing the identity of the shooter, and later named the shooter as Darius Joseph[14], a fellow member of a group that included local rappers and referred to themselves as the “Cain Muzik Mafia.” Chesterfield ultimately admitted, but then wavered as to whether he was the shooter. At one point, Chesterfield indiqated that months before the instant.offenses, the deceased 13victim had tried to kill him or shoot at him, but the victim’s gun jammed. Chesterfield also indicated that the deceased victim also brandished a gun the night of the instant shooting.
ASSIGNMENT OF ERROR NUMBER ONE
In assignment of error number one, the defendant argues that' the trial court erred in denying her motion for postverdict judgment of acquittal based on the claim that the verdict is contrary to the law and evidence, specifically in light of a lack of evidence of a conspiracy to kill, that she had the specific intent to kill or inflict *228 great bodily harm to either of the victims, Key or Vicks, or that she was aware of Chesterfield’s intent to commit ’the offenses. The defendant argues that the images and text messages included in the phone records introduced by the State fell short of establishing the State’s theory that this crime was the result of a stalking or hunting expedition. The defendant further argues .that the images and text messages had little, if any, connection to the events of the night in question, and that Her conne'ction to the evidence was tenuous at best. The defendant specifically notes that she was not present at the location where the group met before the shooting and she was not involved in any of the text conversations regarding the lookout. The defendant contends that while Francois stated that Chesterfield was on the phone with her just prior to the shooting, his testimony about that conversation did not include any mention of guns or shooting someone. The defendant further argues" there is evidence that after the shooting, she made an excited utterance indicating surprise by Chesterfield’s actions, evidence she contends established that she was not a principal to the offenses. Defendant argues that the State improperly accused her of destroying evidence, by obtaining a new phone after the shooting, and attempted to infer guilt on her part based on that evidence. The defendant maintains the State failed to prove she destroyed any evidence noting that the SIM card from the old phone was transferred to her new phone, thereby retaining any calls that were made with the old phone. The defendant maintains if anything, the evidence established her actions are more indicative simply of being an accessory after the fact.
INAPPLICABLE LAW
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof of each of the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P., art. 821(B); State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The Jackson v. Virginia standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the fact finder, in prder to convict, must be satisfied the overall evidence excludes every reasonable hypothesis of. innocence, When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Moten, 510 So.2d 55, 61 (La. App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987).
The crime of second degree murder, in pertinent part, “is the killing of a human being: (1) [w]hen the offender' has a specific intent to kill or to inflict great bodily harm[.]” La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant’s *229 actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625 (La.App. 1 Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923.
InBattery is defined, in pertinent part, as the intentional use of force or violence upon the person of another. La. R.S. 14:33. The offense of aggravated battery “consists of the intentional use of force or violence, with a dangerous weapon, upon the person of another.” State v. Howard, 94-0023 (La. 6/3/94), 638 So.2d 216, 217 (per curiam,); see also La. R.S. 14:33 and La. R.S. 14:34(A). A dangerous weapon is any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm. La. R.S. 14:2(3). Aggravated battery requires neither the infliction of serious bodily harm nor the intent to inflict serious injury. Instead, the requisite intent element is general criminal intent. See Howard, 638 So.2d at 217. General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2). In general intent crimes, the criminal intent necessary to sustain a conviction is shown by the very doing of the acts that have been declared criminal. Howard, 638 So.2d at 217.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. Mere presence at the scene of a crime does not make one a principal to the crime. Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. See State v. Pierre, 93-0893 (La. 2/3/94), 631 So.2d 427, 428 (per curiam). However, “[i]t is sufficient encouragement that the accomplice is standing, by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.” State v. Anderson, 97-1301 (La. 2/6/98), 707 So.2d 1223, 1225 (per curiam).
1 ^APPLICATION OF LAW TO EVIDENCE PRESENTED/ANALYSIS
On July 1, 2012, Corporal Monroe Carter of the BRPD, Crime Scene Division, processed the vehicles occupied by the victims and the suspects, after they were transported to the storage facility. In processing the victims’ vehicle, he photographed the blood and bullet holes on the seats, including a bullet hole in the headrest of the front passenger seat. Corporal Carter also took DNA swabs from door handles and other areas of the vehicle. Based on his assessment of the trajectory, Corporal Carter noted that it appeared that the bullet was fired from the top of the vehicle by a tall person, and travelled through the passenger headrest to the back' seat floorboard on the passenger side, where the bullet was recovered.
BRPD Crime Scene Division Corporal Glynn Averette also collected and swabbed evidence in this case, including the pistol found in the suspects’ Camry, seven live rounds, and an iPhone. He noted that the pistol appeared to have malfunctioned or jammed, as the slide was neither locked all *230 the way to the rear, nor was it forward, and a projectile was stuck in the ejection port. Detective Harris, on the other hand, testified that the other revolver, located in the trunk of the vehicle occupied by the victims, had not been fired. She noted that the revolver was fully loaded, that the bullet holes in the vehicle did not match the revolver, and that the caliber of shell casings collected at the scene of the shooting and the bullet recovered from the deceased victim could not have come from that weapon.
Michael Francois admitted at trial to being the driver of the getaway vehicle, the Camry, at the time of the shooting.[15] Before the shooting, Francois, who had been recently released after a week of incarceration, was riding around with his brothei", Willie Francois. He received a phone call from Chesterfield at around 1:30 a.m., asking him for a ride in exchange for money for gas. After dropping off his brother, Francois picked up Chesterfield from an apartment complex on Jefferson Highway. Chesterfield hasat in the front passenger seat, and a male individual who was with Chesterfield sat in the back seat behind Chesterfield. Francois was not familiar with the other individual, but later determined that he was Samuel Nicholas, noting that he recognized Nicholas in videos on the internet before the shooting.
Francois stated that Chesterfield instructed him to go to College Drive but did not indicate why he wanted to go to that area. While driving to College Drive, Chesterfield engaged in a telephone conversation on speakerphone, and Francois recognized the person’s voice on the speaker as the defendant’s. Francois heard the defendant questioning Chesterfield’s whereabouts and telling him to “hurry up.” He also heard the defendant indicate to Chesterfield that she was following “whoever the guy was” through Walmart and that the person was getting ready to leave the store. Taking directions from Chesterfield and the back seat passenger, who were telling him to “hurry up,” Francois took the College Drive exit and turned to go toward the Walmart through the Albert-son’s parking lot. Francois stated he could still hear the defendant on the speakerphone, and she was telling Chesterfield that they had left the store and she was in her car, following “the person.” Shortly thereafter, as his passengers directed him, Francois turned onto the side street and could hear the defendant on the speaker phone asking Chesterfield if they could see her, that she was right there, in the car behind them. At this time, Nicholas (back seat passenger) pulled out a gun and passed it to Chesterfield stating, “Man, here. Go with your move.” Chesterfield got out of the car, approached the victims’ vehicle and fired two shots into the car. Francois heard the defendant on the phone state, “Girl, I know Chad just didn’t.” Later on the night of the shooting, after arriving home, Francois told his girlfriend, Cierra Henry, to call the authorities and report that her vehicle, the Toyota Camry, had been stolen.
Detective Caan Castleberry of the BRPD homicide division, and an investigator in the shooting, testified regarding the Walmart surveillance footage that he obtained for the time period prior to and until the shooting, as the surveillance videos were shown to the jury. One of the videos depicts the entrance of the Walmart and customers as they exit the store. Detective Castleberry pointed out on the vid *231 eo when the two victims 114exited the store at 2:19 a.m., and stopped to speak with a female (the defendant) outside the store. The defendant is also seen on the video, exiting a black SUV at 2:19 a.m., and stopping to speak briefly with the victims. The victims are seen walking back towards and getting into their vehicle, as the defendant is also shown, going back to and getting into the black SUV. Surveillance footage at 2:23 a.m. shows the defendant’s vehicle backing up, then proceeding forward, and positioning the SUV behind the victims’ vehicle as they headed out of the parking lot to turn onto Rabey Street, to turn left and get onto College Drive. The video shows the victims’ vehicle pass by on Rabey Street and the defendant’s vehicle also turning left out of the driveway. At 2:25 a.m., footage shows another vehicle (the. suspects’ Camry) exit the Albertson’s parking lot, and then travel in reverse.
Vicks, the surviving victim, testified he was close friends with the deceased victim and they had attended a block party together before the shooting. Vicks confirmed that Jordan Key (the deceased victim) had a gun on his waist that night and also testified that Vicks’ father’s gun was in the trunk of the vehicle. Vicks stated that they “got into it” with some unknown guys when Key bumped into another individual as the police were shutting down the party and telling everyone to leave. The altercation was not physical, consisting only of an exchange of heated words. Vicks stated that he and Key went to the IHOP around midnight and then went to Walmart to use the restroom. After exiting the store, he testified they saw the defendant standing outside the store. Vicks testified that he knew the defendant from going to school with her and that he and Key stopped and briefly talked with the defendant. Vicks asked the defendant for her phone number but she refused. After they exchanged pleasantries, the victims got into their vehicle and proceeded to Rabey Street, planning to go home.
Vicks testified he was driving and Key was sitting in the front passenger seat. Vicks noted that he heard gunshots and initially thought someone was shooting in the area before realizing that someone had fired into the vehicle he was driving. He then realized that Key was not speaking and thought that the back window was shot out, though he was not certain. He did not know how many shots were fired, stating that he hfitook off down College Drive, trying to proceed home. He lost control of theyehicle as he travelled across the median at a fast rate, travelling on the wrong side of the road. After going across the median, he discarded the gun that was on the victim’s waist. At that point, he considered taking Key, who was nonresponsive, to the hospital, but the vehicle had been damaged and began swerving. He stopped on Acadian Thruway by the Iberia Bank and called 911. Vicks testified that Key never pulled out his gun that night, further testifying that he did not know Key had a gun until his body fell over as the out-of-control vehicle went over the median. Vicks stated that he discarded the gun because he knew police officers were approaching. He further stated that they had ski masks in the vehicle because they had contemplated robbing someone that night because Key needed money. He testified, however, that they did not have any particular victim in mind and never actually attempted to rob anyone that night. Vicks testified he did not know Chesterfield or Nicholas before the incident. When asked why he. gave the police the defendant’s name after the shooting, he testified, “Because after, after, after like we walked out of Walmart [sic] like I felt like she was stalling, and I felt like she was the one that like—because' nobody else was out there. They had no cars out there. The *232 only cars was in IHOP parking lot. I felt like she had set us up.”
Darius Joseph testified that he, along with about fifteen other individuals, were part of the Cain Muzik Mafia group, which often met at the apartment complex on Jefferson Highway, where Francois picked up Chesterfield on the night in question. During the early morning hours,, after the shooting had taken place, Joseph testified he saw Chesterfield, the defendant, and Nicholas at the apartment complex and recalled them having a conversation about the instant shooting.[16]' Joseph stated that Chesterfield told'him that he vomited, and dropped the gun and a cell phone as he ran from the scene after the shooting. Joseph testified that Chesterfield did not tell him who the victims were and did not provide any additional facts about the shooting. lifiHowever, Joseph stated he later found out more information about the shooting from other members of his household. He stated that Nicholas did not talk much, and that the defendant told him that she was there in the parking lot that night, but stayed in her car. Joseph further stated that the defendant was nervous and “panicky talking.”
BRPD Detective Robert Hunt, of the high-tech crime unit, examined the cell phones recovered in this case. The police determined that one of the I-phones recovered from the Camry was being shared among Chesterfield, Chesterfield’s girlfriend (identified as “Ty” or Tykeshia, the designated owner of the phone), and the defendant. Detective Hunt specifically testified that the defendant’s SIM card was placed into Ty’s phone the day before the shooting, as evidenced by a portion of the forensic report for the phone.[17] That night, Ty’s phone received incoming text messages [18] from one of the other cell phones in evidence stating, “I left myy [sic] gun ...,” and later asking, “See if yu [sic] can go get myy [sic] gun.”
FBI Special Agent Mark Sedwiek analyzed the call detail records in this case provided by AT & T and Sprint for four telephone numbers, revealing usage of the phones in the area of the shooting and the apartment complex on Jefferson Highway, around the time of the shooting. The records confirmed that one of the cell phones, recovered from the Camry abandoned near the scene of the shooting, received á call from the defendant’s phone number minutes before the shooting. The records further show that the defendant’s cell phone was utilizing the tower that covered the area of the murder scene minutes prior to and at the time of the shooting, at 2:27 a.m., that the phone was used out of the area minutes later, and that the phone returned to the coverage area of the shooting within ten minutes following the shooting. At approximately 4:00 a.m., the defendant’s cell phone was utilizing the tower that covered the area of the apartment complex on Jefferson Highway.
117The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, *233 the matter is one of the weight of the evidence, not its sufficiency. State v. Richardson, 459 So.2d 31, 38 (La. App. 1 Cir. 1984). The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder’s determination of guilt. State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932.
On appeal, the defendant cites State v. Pierre, 93-0893 (La. 2/3/94), 631 So.2d 427, 428 (per curiam), in arguing that the State did not prove that she had the requisite intent to kill or inflict great bodily harm on “Jordan Key”.' In Pierre, the defendant was convicted of manslaughter after having been charged as a principal to second degree murder under La. R.S. 14:30.1(1). On appeal, the Louisiana Court of Appeal, Third Circuit, affirmed the conviction and sentence. State v. Pierre, 614 So.2d 1309 (La. App. 3 Cir. 1993). The Louisiana Supreme Court reversed the defendant’s conviction, concluding that his mere presence at and near the crime scene did not demonstrate that he had the requisite intent to kill the victim so as to make him a principal to the crime. Pierre, 631 So.2d at 429. The supreme court noted that the jurors had no direct or circumstantial evidence that the defendant therein counseled or procured the others to kill the victim or that he participated in the actual murder. The defendant herein also relies on State v. McGhee, 2015-285 (La.App. 3 Cir. 11/4/15), 179 So.3d 739, wherein the third circuit found the evidence was insufficient to support the defendant’s conviction of simple kidnapping as a principal. The court found that while the State may have proven the codefendants had the intent and performed the actions that would constitute kidnapping the victim, it failed to identify how the defendant would have known of their intent to kidnap and possibly do physical harm to the victim. The court concluded that “[a]t most, the State proved that [McGhee] was present when the victim was kidnapped and failed to stop the kidnapping or report it to authorities.” McGhee, 179 So.3d at 746-47.
[ isThe present case is distinguishable from Pierre and McGhee in that herein the defendant’s actions constituted more than just her mere presence at the crime scene. In this case the evidence, including the surveillance footage, phone records, and testimony, shows the defendant was not only present and aware, but was further involved and played an active role in leading- and counseling Chesterfield regarding the victims’ whereabouts, and stopping and stalling the victims just before the shooting. Chesterfield claimed that he shot the deceased victim because the victim tried to kill him about two months before the instant offenses, further claiming that he saw the victim’s gun on the night in question. Francois testified that he realized what was about to happen before the shooting actually occurred based on what he heard during the speakerphone conversation between the defendant and Chesterfield that took place just moments before the shooting. Francois further testified thát during that conversation, the defendant was directing Chesterfield, telling him to hurry up to the scene where the victims were heading, further informing him that the victims were proceeding to leave the , area. (While the jurors were aware of the fact that Francois was not fully forthcoming and gave inconsistent accounts prior to the trial, he also indicated, that he feared the defendants. The jury was free to accept Francois’s trial testimony.) After the shooting, the defendant, Chesterfield, and Nicholas went back to the apartment complex on Jefferson Highway, where they talked about the shooting in the presence of Joseph.
Under the broad definition of “principals” in Louisiana, the jury did not have to *234 find that the defendant was the one who fired the shots in order to be convicted of the offenses. Rather, the jury had to find that she had the requisite mental state (intent) and was concerned in the commission of a crime, whether present or absent, and whether she directly committed the acts constituting the offenses, aided and abetted in their commission, or directly or indirectly counseled or' procured another to commit the crimes in order to be prosecuted as a principal. See La. R.S. 14:24; State v. Arnold, 2007-0362 (La.App. 1 Cir. 9/19/07), 970 So.2d 1067, 1072, writ denied, 2007-2088 (La. 3/7/08), 977 So.2d 904.
|13We note that , the defendant made pretrial statements, concerning her actions just before the shooting and the identity of the shooter, that were directly controverted at trial by surveillance footage, the testimony of Champagne, and the defendant’s own statement immediately after the shooting indicating that she knew Chesterfield was the shooter, Lying or purposeful - misrepresentations reasonably raise the inference of a “guilty mind” and has been recognized as indicative of an awareness of wrongdoing. State v. Captville, 448 So.2d 676, 680 n.4 (La. 1984).
The defendant’s denial of being actively involved preceding the shooting is contradicted by the evidence in the record before us. A rational juror could have found that the defendant was not merely a bystander who took no part in the criminal activity, but instead aided and abetted in the commission, or directly or indirectly counseled or procured another to commit the crimes. In reviewing the evidence of the defendant’s actions, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662. In accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder, a court of appeal impinges on a fact finder’s discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. See State v. Mire, 2014-2295 (La. 1/27/16), - So.3d -, -, 2016 WL 314814 (per curiam). An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam ). Viewing the evidence presented at trial in the light most favorable to the State, we are convinced that any rational trier of fact could find the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and aggravated battery regarding the defendant. Thus, assignment of error number one lacks merit.
I ¡.(ASSIGNMENT OF ERROR NUMBER TWO
In assignment of error number two,.the defendant argues that the trial court abused its discretion in denying her motion for new tidal. She argues that there were several instances wherein the jury could have drawn improper inferences that led to her conviction. Thus, the defendant contends that the ends of justice would be served by granting her a new trial.
We note that a trial judge’s determination regarding the weight of the evidence under Article 851(1) of the Code of Criminal Procedure is not reviewable on appeal, except for error of law. State v. Korman, 439 So.2d 1099, 1101 (La. App. 1 Cir. 1983); see also La. C.Cr.P. art. 858. Article 851(5) allows the trial court to grant a new trial if the ends of justice would be served although the defendant may not be entitled to a new trial as a matter of strict legal right. The grant or denial of a new trial pursuant to Article *235 851(5) does not involve questions of fact. In deciding whether the trial court abused its great discretion in granting or denying a new trial under Article 851(5), we keep in mind two precepts. One, in this provision the trial court is vested with almost unlimited discretion and its decision should not be interfered with unless there has been a palpable abuse of that discretion. Two, this ground for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded. State v. Guillory, 2010-1231 (La. 10/8/10), 45 So.3d 612, 615 (per curiam). In this case, the defendant has made no showing below or on appeal that an error of law, injustice, or abuse of discretion was committed. Thus, we find no merit in assignment of error number two.
CONCLUSION
Based on the record before us, and for the reasons explained herein, we find no error and affirm Essence Dyson’s convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED.

. The defendant was charged and tried along with codefendants Chattley Chesterfield and Samuel Nicholas. As with the defendant herein, the jury found codefendant Chesterfield guilty as charged of second degree murder on count one and guilty of the responsive offense of aggravated battery on count two. Chesterfield has also filed an appeal in this court, challenging the sufficiency of the evidence on the grounds that he shot the victims in self-defense. State v. Chesterfield, 2016-1570, 2017 WL 2399029 (La. App. 1 Cir. 6/2/17). Codefendant Nicholas was found not guilty on both counts.

. Although the concurrent nature of the sentence was not expressly ordered by the trial court, the sentences shall be served concurrently pursuant to La. Code Crim. P. art. 883, . as the trial court did not expressly state otherwise and the offenses are based on the same act or transaction.

.As noted later herein, there were three separate crime scenes reported arising from this incident. The first was the location of the victims’ vehicle, which had travelled away from the crime scene following the shooting, with the deceased passenger laying across the seat, and was found behind Iberia Bank at the intersection of Perkins Road and S. Acadian Thruway. The second crime scene was at Ra-bey Street and Bennington, which is crossed by College Drive (the original crime scene); *224 and the third was the dead-end of Rabey Street at Balis Street, where the suspects' vehicle was found, abandoned after pursuit.

. Deceased victim Keys suffered two gunshot wounds, including a fatal shot that entered the right base of his skull, from the right side to the left, with the projectile being recovered from underneath the skin. The non-fatal gunshot wound was in his left shoulder, and there was no projectile recovered as to that wound since the bullet travelled completely through the body, with the entrance being just slightly on the victim's back. Vicks was transported to the hospital by Emergency Medical Services with non-life threatening injuries.

. Champagne also recalled allowing a black or dark colored SUV being driven by a female to pass in front of him prior to the shooting, Consequently, he was uncertain of his ability to identify the shooter. He participated in a photographic lineup right after the offenses but did not identify Chesterfield as the shooter.

. Cheryl Swearingen, a forensic scientist at the Louisiana State Police Crime Laboratory (LSPCL) and expert in firearm examination, examined the .40 caliber semi-automatic pistol found in the Camry along with two bullets and three bullet cartridge cases recovered from the deceased victim and the victims’ vehicle, and determined that the bullets and shell casings were fired from the pistol,

. Henry initially reported that her vehicle had been stolen that night in a carjacking. However, during police questioning about five hours after the incident, she admitted that her claim was untruthful.

. Glenn Fahrig, a LSFCL expert in DNA analysis, testified that Francois could not be excluded as the major contributor of mixed DNA samples from the baseball cap located on the ground near the Camry and die front-passenger handle of the Camry. Mark William Perlin, chief scientist and expert in DNA evidence interpretation, testified regarding the match between the DNA sample from the pistol used in the shooting and the defendant’s DNA profile, stating that it "is 108,000 times more probable than a coincidental match.” Codefendant Samuel Nicholas was also a contributor to the DNA profile from the pistol, at a likelihood of 3.21 thousand times more probable than coincidental.

. The music video also featured codefendant Samuel Nicholas, known as "Mista Cain.”

. The police later interviewed a witness who indicated that Vicks was armed that night while working as a security guard at a party and that Vicks consumed alcohol that night. The day after the shooting, the police recovered the firearm that was tossed by Vicks, a .22 caliber pistol.

. The parties agreed to play the majority of the recorded interview at trial.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Detective Harris concluded that the defendant was implicating Francois as the shooter, noting that Francois had a tattoo on his forehead as described by the defendant.

.Chesterfield specifically stated that in a conversation that took place after the shooting, Joseph told him that he "went with his move,” an assertion that Chesterfield claimed he interpreted as a confession to the shooting.

. After portions of Francois’s pretrial interviews were played to refresh his memory, he was allowed to correct some aspects of his testimony. He admitted that he was initially dishonest with the police out of fear.

. Outside of the presence of the jury, a portion of Joseph’s pretrial interview was played to refresh his memory of the conversation.

. A text message sent that day from the defendant’s phone number states in part, “oh ok but im [sic] finna [sic] give Ty her phone back so ima txt [sic] you when i get off.”

.Records indicated that the text messages were sent from a telephone number used by codefendant Nicholas days before the shooting.