# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

* * * * * * *

## 2018 KA 1441

## STATE OF LOUISIANA

## VERSUS

## JASON L. ROBINSON

JUDGMENT RENDERED:  **NOV. 2 0 2019.**

* * * * * * *

Appealed from the
Twenty-Second District Court
In and for the Parish of St. Tammany • State of Louisiana
Docket Number 573067 • Division "G"

The Honorable Scott Gardner, Judge Presiding

* * * * * * *

Jane L. Beebe
*Louisiana Appellate Project*
New Orleans, Louisiana

ATTORNEY FOR APPELLANT
DEFENDANT—Jason Robinson

Warren L. Montgomery
*District Attorney*

ATTORNEYS FOR APPELLEE
The State of Louisiana

Butch Wilson
*Assistant District Attorney*
Covington, Louisiana

* * * * * * *

**BEFORE: McCLENDON, WELCH, AND HOLDRIDGE, JJ.**

Holdridge J. Concurs in result·

**WELCH, J.**

The State of Louisiana charged the defendant, Jason L. Robinson, by felony bill of information with one count of hit and run driving, when death or serious bodily injury is a direct result of the accident, a violation of La. R.S. 14:100(C)(2). He pled not guilty. Following a trial by jury, the jury found the defendant guilty of attempted hit and run driving, when death or serious bodily injury is a direct result of the accident, a violation of La. R.S. 14:27 and 14:100(C)(2). The trial court sentenced the defendant to five years at hard labor, but suspended the sentence and placed him on supervised probation for a period of three years, subject to certain special conditions. The defendant now appeals, challenging the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On July 28, 2015, at approximately 5:45 a.m., the victim, Mario Granado, left his house in Mandeville to commute over the Causeway for his job. Because the weather was "beautiful," he chose to drive his motorcycle. Granado testified that he was struck from behind twice while he was on the Causeway in St. Tammany Parish. He testified that the motorcycle went out from under him, and he flipped over the back of the bike and landed on the Causeway, where his body began rolling, flipping, sliding, and skidding across the pavement. Granado stated he attempted to roll and flip his body into a position on the Causeway to avoid being run over by the other cars and an eighteen-wheeled tractor-trailer nearby him.

Another driver, Michael Earls, saw the accident occur and noticed that a red Camaro had struck Granado and accelerated after the accident. Earls pursued the red Camaro and turned on his lights to signal the red Camaro to stop. The red Camaro then pulled over in front of Earls, stopped, and turned its hazard lights on. Earls called 911 to report the incident and that he had stopped the red Camaro on

the side of the roadway.

Corporal Tyrone Banks with the Causeway Police Department was stopped at mile marker 12.4 awaiting a red Camaro to reach that crossover, as witnesses had reported a red Camaro travelling at a high rate of speed and weaving in and out of traffic. After receiving a dispatch that someone had stopped the red Camaro, Corporal Banks drove to the scene and discovered the defendant and Earls stopped at mile marker 12.8.

The rear end of Granado's motorcycle was damaged, with the exhaust pipe pushed out and the license plate "pushed in." Because the frame was bent and twisted, the motorcycle was totaled, and the damage indicated the bike had flipped end to end multiple times. Tire marks from the defendant's Camaro's left tire were found on the tailpipe of the motorcycle. The defendant's Camaro sustained "significant damage," primarily to its left front end.

Ultimately, Granado sustained a number of injuries from the crash, including a broken left foot; a broken right ankle; a broken wrist; an injured shoulder blade; injuries to his lower back, including a herniated disc; and "road rash," a condition similar to second or third-degree burns, down his back. He underwent surgery on his wrist, skin graft surgeries on his back and nose, and physical rehabilitation.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, the defendant contends that the evidence was insufficient to convict him of attempted hit and run driving, when death or serious bodily injury is a direct result of the accident. The defendant claims that the State presented conflicting witness testimony to prove the defendant knew he caused the accident and failed to stop and/or tried to flee. The defendant acknowledged that he has never denied that he caused an accident on the Causeway or that the victim suffered serious bodily injuries. Instead, the defendant claims that he did not flee the scene of the accident and that there was no criminal intent. The defendant

3

claims he stopped his car and put on his hazard lights at mile marker 12.8, which is 0.2 miles from the accident, and 0.4 miles from the first turnaround point on the Causeway past the accident location.

Further, the defendant claims the evidence does not support Michael Earls's assertion that he "pulled Mr. Robinson over." He argues that Earls was parked behind his car on the Causeway and in the police video, only he, and not Earls, had hazard lights flashing. The defendant also points to allegedly conflicting testimony from Corporal Banks and Earls regarding the location of the defendant's keys after the accident, Earls's testimony regarding the defendant's statement he did not know he had caused an accident, his cooperativeness with Corporal Banks, and expert testimony that Earls's Ford Escape did not have enough acceleration to catch up to the defendant's Camaro.

The defendant further points to the allegedly inconsistent testimony from two other witnesses, Richard Powers and Anthony Arellano, who both claimed to be directly behind the defendant's car in the right lane when the accident occurred. The defendant also claims that in contradiction to Earls's testimony, Powers testified he saw no one chase the defendant's Camaro. The defendant also highlights the allegedly conflicting testimony regarding whether the victim landed on the hood of his Camaro after being struck.

Finally, the defendant claims the defense and State offered conflicting expert testimony. The defendant claims the conclusions reached by both experts were similar and that the expert called by the State on rebuttal, James Evans, did not perform as much research on the case as the expert called by the defense, Edward Carrick.

The constitutional standard for testing the sufficiency of the evidence, as enunciated in **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979), requires that a conviction be based on proof sufficient for

4

any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. La. C.C.P. art. 821; **State v. Crowson**, 2010-1283 (La. App. 1st Cir. 2/11/11), 2011 WL 2135102, at *6 (unpublished), writ denied, 2011-0528 (La. 11/23/11), 76 So. 3d 1146. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove in order to convict," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438; **Crowson**, 2011 WL 2135102, at *6.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Forrest**, 2016-1678 (La. App. 1st Cir. 9/21/17), 231 So. 3d 865, 870, writ denied, 2017-1683 (La. 6/15/18), 257 So. 3d 687.

At all times relevant hereto, La. R.S. 14:100, provided, in pertinent part:

> A. Hit and run driving is the intentional failure of the driver of a vehicle involved in or causing any accident, to stop such vehicle at the scene of the accident, to give his identity, and to render reasonable aid.
>
> B. For the purposes of this Section:
>
> (1) "To give his identity", means that the driver of any vehicle involved in any accident shall give his name, address, and the license number of his vehicle, or shall report the accident to the police.
>
> (2) "Serious bodily injury" means bodily injury which involves unconsciousness, extreme physical pain, or protracted and obvious disfigurement, or protracted loss

or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.[1]

Reasonable aid within the meaning of La. R.S. 14:100 is aid that is fair, proper, or moderate under the circumstances. Evidence that a defendant caused an accident, left the scene, and failed to render reasonable aid is sufficient to establish the requisite general intent necessary to sustain a conviction for hit and run driving. **State v. Craig**, 2012-1262 (La. App. 1st Cir. 3/22/13), 2013 WL 1189433, at *4 (unpublished), writ denied, 2013-0902 (La. 11/8/13), 125 So. 3d 444. The failure to stop to render aid must be an intentional act. To intentionally fail to stop, the driver must be aware than an accident has occurred. **State v. Guidroz**, 2007-1548 (La. App. 1st Cir. 2/8/08), 2008 WL 426071, at *2 (unpublished).

The defendant's contentions regarding the weakness of the witness testimony of Earls are without basis in the record. Although Earls was parked behind the defendant on the Causeway, the positioning of the cars indicates only that the defendant voluntarily pulled over to the side of the road. With regard to the defendant's argument that the police video contradicts Earls's testimony that he thought he flashed his lights at the defendant to force the defendant to stop, we note Earls testified he put on his flashers and "brights" when he was approaching the defendant's Camaro. We note, however, that Earls did not testify as to whether he kept his flashers on after he and the defendant pulled over. Further, a review of Corporal Banks's dashcam video reveals that neither the defendant nor Earls had his flashers on, but Corporal Banks arrived on the scene after Earls had pulled the defendant over to the side of the road. Thus, the dashcam video does not contradict Earls's testimony for the simple reason that it does not show the time frame during which Earls testified he turned on his flashers.

---

[1] While not applicable to this appeal, we note that in 2019, the Louisiana Legislature repealed the definition of "serious bodily injury" found in La. R.S. 14:100(B)(2), in order to provide a universal definition of that term for purposes of Title 14 of the Revised Statutes. See 2019 La. Acts No. 2, § 3 (eff. Aug. 1, 2019).

6

The defendant claims that various alleged inconsistencies in the testimony adduced at trial established that he neither fled the scene nor had "any criminal intent." Although Earls's testimony differed from that of Corporal Banks regarding the location of the defendant's keys—whether the keys were on top of the car, as Earls testified, or in the Camaro, as Corporal Banks testified—that testimony does not prove that the defendant did not flee the scene. Similarly, the conflicting witness testimony from Powers and Arellano—that both were "directly" behind the defendant in the right lane when the crash occurred—does not show that the defendant either did not flee the scene or did not have criminal intent.

The defendant also points to the differing testimony regarding whether the victim flipped over the hood of the Camaro. Earls testified that the victim flipped over the hood of the Camaro. Arellano testified the victim fell off his motorcycle and onto the ground and did not land on the Camaro. The victim testified that when he fell off his motorcycle, he felt as though he hit the pavement with his helmet, but he was not sure if he hit the car also because he went up in the air and went backwards. He felt himself "spinning around, sliding and rolling." Whether the victim flipped over the defendant's hood or not does not establish the defendant did not flee or did not have criminal intent. Finally, the fact that Powers testified he did not see another vehicle chase the defendant's Camaro does not establish that no vehicle did so; indeed, Earls testified that he pursued the defendant and parked behind the defendant on the Causeway. Testimony from Arellano, Powers, and Earls establishes that after they saw the defendant's Camaro strike the victim, the defendant kept traveling down the Causeway and, according to Arellano and Earls, even continued to accelerate. The victim also testified that after the accident, he never met the person who struck him on the road.

The defendant is correct that Earls testified the defendant immediately stated

he did not know he had hit anyone, and that another responding Causeway Police Department officer, Corporal Tristan Thomas, testified the defendant stated he did not know that he had hit anyone. Corporal Banks added the defendant was cooperative and nervous, but made no attempt to flee the scene. The defendant omits, however, the rest of Corporal Thomas's testimony, in which Corporal Thomas explained that after he arrived on the scene, the defendant first said he did not know what had happened and did not do "whatever everybody said he did." The defendant then advised Corporal Thomas that he did not believe he had done anything, but he did see "the guy" flipping in his mirror, but because he did not believe he had done anything wrong, he continued down the road. Corporal Thomas testified the defendant's "third story" was that he left the scene because he panicked. The defendant's final explanation to Corporal Thomas was that he denied "anything, everything. That he didn't do anything."

The expert in engineering and vehicle accident reconstruction called by the defense, Edward Carrick, worked on the case. Carrick heard or read the testimony of the other witnesses at trial and added he could find no written rules dictating the proper procedure for drivers to follow if they are involved in a crash on the Causeway and that the research he performed on the issue yielded multiple answers, depending on the circumstances involved. Carrick also indicated that there was no written policy regarding what to do on the Causeway if someone is involved in an accident, but the car is able to move. In preparing his report, he relied upon the police crash report, which indicated the crash occurred at mile marker 13, but did not perform any physical testing because he did not have a Camaro or a motorcycle to test. Carrick further testified he believed it was impossible for Earls's Ford Escape to catch up to the defendant's Camaro unless the Camaro was already braking before the Ford approached because the Camaro had a more powerful engine and had a "head start" on the Ford Escape. We also

note that in contradiction to Carrick's testimony on cross-examination that the driver of a Camaro could feel the impact of a dog, but it was possible for the driver of a Camaro not to feel the impact of a human being, Carrick concluded in his report that it was more likely than not that the defendant immediately felt the impact of striking the victim. In support of this conclusion, we further note that the victim's motorcycle was totaled as a result of flipping from end to end several times, that it had tire marks from the defendant's Camaro on the tailpipe, and that the defendant's Camaro sustained "significant damage."

James Evans, the expert in accident reconstruction offered by the State on rebuttal, listened to the testimony of Carrick, reviewed photographs of the crash, used measurements from Google Earth and satellite image programs, and a drawing he made using AutoCAD, in addition to performing "some testing with some similar vehicles" to illustrate the damage sustained in the crash. Evans also reviewed a copy of the police report, two dashcam videos taken from police cars, an "expert report written by the other side," some testimony from the witnesses that testified at trial, and photographs of the vehicles taken at the scene of the accident. When asked, Evans stated he could not determine any error in Carrick's calculations because Carrick did not include enough of his "work" for Evans to determine his accuracy. Evans used a "pro version" of Google Earth that has a history of being "very accurate" to measure the width of the roadway and dimensions, and to double check its information, he found a publication on the Causeway from a civil engineering magazine to check the widths of the Causeway's lanes. We note that in contrast to Carrick, Evans recreated the accident scene in a park using a Camaro and motorcycle that had similar dimensions to the defendant's Camaro and the victim's motorcycle. We further note that, consistent with the testimony from Arellano, Powers, and Earls—that the defendant did not slow down on the Causeway after striking the victim—Evans

testified the defendant must have continued to travel after striking the victim because the distance the Camaro traveled was not "normal," and if the defendant had pulled over, he would have stopped sooner than the 12.8 mile marker. Evans agreed with Carrick's conclusion that more likely than not, the defendant immediately perceived an impact with the victim's motorcycle when the accident occurred, and disagreed with Carrick's conclusion that the Ford Escape was unable to surpass the defendant's Camaro in the timeframe available. Evans testified he believed the accident occurred north of mile marker 13 because of where the vehicles came to rest. When questioned why he believed the accident occurred north of mile marker 13 in spite of the lack of testimony regarding such, and as to what the police report meant when it stated the accident occurred at mile marker 13 or "just before," Evans acknowledged that although it could mean the accident occurred at mile marker 12.9 or 12.95, it would not matter because all the distances involved in this case are very large ranges. He explained that he and Carrick could have reached different conclusions if they had used different impact points for the crash.

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A). In **State ex rel. Elaire v. Blackburn**, 424 So. 2d 246, 251 (La. 1982), cert. denied, 461 U.S. 959, 103 S. Ct. 2432, 77 L. Ed. 2d 1318 (1983), the Louisiana Supreme Court recognized the legitimacy of a "compromise verdict," *i.e.*, a legislatively approved responsive verdict that does not fit the evidence, but that (for whatever reason) the jurors deem to be fair, as long as the evidence is sufficient to sustain a conviction for the charged offense. If the defendant timely objects to an instruction on a responsive

verdict on the basis that the evidence does not support that responsive verdict, the court overrules the objection, and the jury returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict. However, if the defendant does not enter an objection (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury. **State ex rel. Elaire**, 424 So. 2d at 251.

In this case, there was no objection to the instruction on the responsive verdict of attempted hit and run driving, when death or serious bodily injury is a direct result of the accident. The jury's ultimate reasoning for returning this responsive verdict is unclear, but it is possible that this verdict represented a "compromise." Regardless of the jury's ultimate reasoning, because the evidence presented at trial was sufficient to convict the defendant of the charged offense, it was also sufficient to support the defendant's conviction for the responsive offense of attempted hit and run driving, when death or serious bodily injury is a direct result of the accident.

The conviction reflects that the jury accepted the victim's testimony, as well as that of the eyewitnesses to the crash—Arellano, Powers, and Earls—and of the expert called by the State, James Evans, and rejected the defendant's attempts to discredit them. Their testimony established that the defendant caused an accident on the Causeway by striking the victim's motorcycle, then left without rendering aid. This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. Rather, the trier of fact may accept or reject, in whole or in part, the testimony of any witness. When there is

11

conflicting testimony, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. **Craig**, 2013 WL 1189433, at *5.

When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So. 3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So. 3d 685. No such hypothesis exists in the instant case. In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So. 2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So. 3d 417, 418 (*per curiam*). In accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder, a court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law. **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So. 3d 698, 703 (*per curiam*). Therefore, this assignment of error is without merit. Accordingly, the defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**