NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2019 KA 1293

STATE OF LOUISIANA

VERSUS

CELITO C. JACKSON

**Judgment Rendered:**   MAY 2 8 2020

* * * * * *

On Appeal from the Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. 09-15-0461

Hon. Beau Higginbotham, Judge Presiding

* * * * * *

Hillar Moore, III
District Attorney
Allison Miller Rutzen
Assistant District Attorney
Baton Rouge, Louisiana

Plaintiff/Appellee
State of Louisiana

Prentice L. White
Baton Rouge, Louisiana

Counsel for Defendant/Appellant
Celito C. Jackson

* * * * * *

BEFORE: McCLENDON, WELCH, AND HOLDRIDGE, JJ.

**McCLENDON, J.**

Defendant, Celito C. Jackson, was charged by an amended bill of information with molestation of a juvenile when the offender has control or supervision over the juvenile, a violation of LSA-R.S. 14:81.2. He entered a plea of not guilty. After a trial by jury, defendant was found guilty as charged.[1] The trial court denied his motion for post-verdict judgment of acquittal and motion for new trial. The trial court sentenced defendant to fifteen years imprisonment at hard labor, suspended all but four years of the sentence, and imposed five years of active, supervised probation with special conditions.[2] Defendant now appeals, assigning error to the admission of other crimes evidence and the sufficiency of the evidence.[3] For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

K.S., who was born on January 13, 1998, and was twenty years old at the time of trial, testified that she met defendant while she was in elementary school, when he and her mother, T.S., began dating.[4] K.S. was still in elementary school when defendant and her mother were married on April 15, 2006. K.S. was the only child in the home until her brother was born on December 10, 2008, when K.S. was nine years old. As K.S. further testified at trial, when she was in elementary or middle school,

---

[1] The record reflects that in the initial trial of this matter in 2017, the trial court ordered a mistrial, as the jury was deadlocked. Defendant was then retried and convicted in 2018, as noted above, and now appeals.

[2] In sentencing defendant, the trial court ordered the following special conditions: (1) pay a $1000 fine plus court costs; (2) pay $150 to the Division of Probation and Parole for the cost of the presentence investigation report; (3) pay a $65 monthly supervision fee to the Division of Probation and Parole; (4) have no contact with the victim; (5) abide by family court orders pertaining to his son; (6) abide by sex offender registration requirements; (7) complete sex offender treatment; (8) submit to random drug testing; (9) maintain full-time job or school status; (10) pay the victim's counseling costs as to be determined at a hearing; (11) complete a court effective decision making class; (12) perform 300 hours of community service in East Baton Rouge Parish at a place where there are no minors; (13) abide by all sex offender contract conditions; and (14) to not go within 1000 feet of any school, bus stop, etc., as delineated in LSA-R.S. 15:538D(1)(b).

[3] Defendant notes that the trial court did not advise him of the two-year prescriptive period for filing for post-conviction relief under LSA-C.Cr.P. 930.8. By virtue of defendant's reference to this omission herein, it is apparent that defendant has notice of the time limitation and/or has an attorney that is in the position to provide him with such notice. Out of an abundance of caution and in the interest of judicial economy, we note that LSA-C.Cr.P. art. 930.8A generally provides that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922. **State v. Godbolt**, 06-0609 (La.App. 1 Cir. 11/3/06), 950 So.2d 727, 732.

[4] Herein, we reference child victims and their immediate family members by initials only. See LSA-R.S. 46:1844W.

2

defendant began having "play fights" with her, which included such acts as "play hitting," pinning her down, and "like wrestling." According to K.S., defendant would put his hand under her shirt and "cup" her breast, remove a knife[5] from his pocket, and say that he was going to cut off her "tatas."

Throughout middle school and as K.S. entered high school, the "play fights" continued, routinely after school, before her mother and brother came home. During one such incident, the play fighting began in K.S.'s parents' bedroom, then continued down the hallway to K.S.'s bedroom. According to K.S., after defendant took her into her bedroom, he bent her over the side of her bed, pulled her pants down, and digitally penetrated her. As K.S. specifically testified, "he took his finger and stuck it in my vagina ... and I, kind of, screamed a little bit." K.S. stated that some nights while she was in high school, she would feel pressure on her vagina, wake up, see defendant, and defendant would tell her, "Don't worry, I'm just checking on you." She described these incidents as painful and noted that it felt like defendant was trying to insert an object inside of her, but she was unsure as to what the object was.

K.S. also detailed another occasion in which she woke up in the middle of the night and saw defendant in her bedroom "masturbating" in front of her, an act which she further described as "his hand going up and down ... toward his penis area, genitiles [sic]." Defendant again told her that he was just checking on her. K.S. testified that she was too embarrassed to tell her mother what happened and did not know how to explain what had occurred.

On January 18, 2014, the weekend after her birthday, K.S. had a "sweet sixteen" birthday party at a hotel. Seven of the invited girls stayed overnight at the hotel for a slumber party. The girls slept in one room that had two full or queen-size beds, while K.S.'s parents had a room down the hall. Three of the girls, A.F., P.T., and C.B., testified at trial that they woke up during the night when defendant entered their room and touched them on private areas of their body. The next morning, the girls informed K.S.'s mother, T.S., what occurred overnight. Also that morning, A.F. informed T.S. of

_____

[5] On cross examination, K.S. testified that she could not recall if she had ever told anyone prior to trial about her claim that defendant pulled out a knife when he said he would cut her "tatas" off during play fights. She conceded that her statement at trial may have been the first disclosure of this detail.

3

an incident that occurred when A.F. spent the night with K.S. months before the party. Specifically, A.F. stated that during the night, she woke up when defendant came into K.S.'s bedroom, put his hand under K.S.'s shirt, squirted lotion onto his hands, and began moving his arm back and forth. To A.F.'s knowledge, K.S. was asleep during the incident. K.S. did not at that point disclose any of the acts that she experienced involving defendant.

Ultimately, K.S. began slowly disclosing information to her mother regarding her personal experiences involving defendant, resulting in T.S. contacting the police on February 23, 2015. On April 3, 2015, after K.S. was interviewed at the Children's Advocacy Center (CAC), K.S. was examined by Dr. Melvin Murrill. At trial, Dr. Murrill, an expert in pediatric treatment, testified that he interviewed K.S. before conducting a gynecological examination. Dr. Murrill testified that the results of the examination were abnormal, as K.S.'s hymen had scarring at the four o'clock and eight o'clock positions. He further testified that the presence of the still visible hymen was inconsistent with prior vaginal intercourse, but consistent with K.S.'s reported history of digital penetration. Dr. Murrill concluded that K.S. had a history of sexual abuse consistent with her complaint.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number two, defendant argues that the State failed to prove beyond a reasonable doubt that he inappropriately touched, masturbated in the presence of, digitally penetrated, or used a foreign object to penetrate the victim. He contends that the State's medical expert could not substantiate the claim that he penetrated K.S., as there was no indication as to when the tearing of K.S.'s hymen took place. Defendant claims that there was no testimony to show that he made threats against K.S. or threatened to take negative action if she ever disclosed the alleged conduct to anyone. Defendant concludes that the evidence is insufficient based on the following arguments: (1) "highly prejudicial and inflammatory" evidence was used to prove his guilt; and (2) the evidence failed to establish that he used his positon of influence, control, or supervision to commit a lewd or lascivious act against K.S.

In cases such as this one, where a defendant raises issues on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should preliminarily determine the sufficiency of the evidence before discussing the other issues raised on appeal. **State v. Legaux**, 19-0075 (La.App. 1 Cir. 9/27/19), 288 So.3d 791, 794. When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion by the court of the trial error issues as to that crime would be pure dicta since those issues are moot. On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. **State v. Hearold**, 603 So.2d 731, 734 (La. 1992); **Legaux**, 288 So.3d at 794. Accordingly, we will first address defendant's second assignment of error challenging the sufficiency of the State's evidence.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; LSA-Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821B; **State v. Ordodi**, 06-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Jackson**, 18-0261 (La.App. 1 Cir. 11/2/18), 265 So.3d 928, 933, writ denied, 18-1969 (La. 4/22/19), 268 So.3d 304. The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. **Legaux**, 288 So.3d at 794.

When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Patorno**, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 144. When a case involves circumstantial evidence and the trier of fact

5

reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Dyson**, 16-1571 (La.App. 1 Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 17-1399 (La. 6/15/18), 257 So.3d 685.   Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the factfinder, is sufficient to support a factual conclusion.   **State v. Marshall**, 04-3139 (La. 11/29/06), 943 So.2d 362, 369, cert. denied, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007).

Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile.  Lack of knowledge of the juvenile's age is not a defense. LSA-R.S. 14:81.2A(1).  The Louisiana Supreme Court has defined "lewd and lascivious conduct" very broadly as any conduct which is "lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to the sexual impurity or incontinence carried on in a wanton manner."  See **State v. Jones**, 10-0762 (La. 9/7/11), 74 So.3d 197, 204.

Thus, in order to commit molestation of a juvenile, the offender must possess the specific intent of arousing or gratifying the sexual desires of himself or the child upon whose person he committed a lewd or lascivious act or in whose presence he committed such an act.  However, specific intent need not be proven as a fact.  It may be inferred from the circumstances of the transaction and the actions of the defendant. **State v. McKinney**, 15-1503 (La.App. 1 Cir. 4/25/16), 194 So.3d 699, 703, writ denied, 16-0992 (La. 5/12/17), 220 So.3d 747.  Specific criminal intent is that state of mind, which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.  LSA-R.S. 14:10(1). Specific intent is an ultimate legal conclusion to be resolved by the factfinder.

6

**State v. Lavy**, 13-1025 (La.App. 1 Cir. 3/11/14), 142 So.3d 1000, 1005, <u>writ denied</u>, 14-0644 (La. 10/31/14), 152 So.3d 150.

The trial in this case began on November 26, 2018. K.S. was only eight years old when defendant became her stepfather in 2006. At trial, K.S. testified that as defendant was her stepdad, she trusted him, she liked him as a person, and she would sometimes confide in him and rely on him for guidance. K.S. indicated that defendant would sometimes sit on the toilet while she was taking a bath and talk to her about certain things, such as school and life in general. According to K.S., this occurred when she was in sixth, seventh, and eighth grades. She noted she sometimes felt uncomfortable and would try to close the shower curtain or bend down to try to cover herself. K.S. further testified that she started developing physically in middle school, and by then, very often, defendant would put his hand in her shirt and touch her breasts during "play fights."

K.S. also described a family vacation that took place while she was in the eighth or ninth grade, during which the family went to a water park, and she wore a bathing suit. She stated that after defendant saw her in the bathing suit, defendant told her mother something, and her mother, in turn, made her put on shorts over her bathing suit. Later, defendant told her that when she was in her bathing suit, he could see her pubic hair, which he called "monkey hair." Thereafter, when her mother was not present, defendant asked her if she wanted to shave the hair with his clippers or a razor. K. S. testified that when they returned home from the trip, she used a razor to shave after defendant again asked her if she wanted to use his clippers. She stated that the comments made her feel weird.

K.S. testified that the incident involving digital penetration took place during a play fight that occurred while she was either still in middle school or during her first year of high school. K.S. described the incident as painful and stated that it made her feel "horrible," "confused," and "violated." She testified that after defendant put his finger in her vagina, he told her not to worry and stated that he was just preparing her in case someone would ever attempt to rape her. She said that defendant further told her that rape would be far worse, as something else other than a finger would be

7

inserted during such an incident. She further testified that defendant told her she did a good job because she had scratched him on his arm during the incident. He told her that her reaction was correct. She noted that she still loved defendant at the time and that she did not tell her mother about the incidents because she was embarrassed, nervous, and did not know how to explain what happened. She elaborated as to her nervousness, noting that she did not know what would happen if she told her mother, that she thought it would cause a big argument between her parents, and that she liked seeing her mother married because the marriage made her mother happy.

When asked if the play fights continued after the incident involving digital penetration, K.S. testified, "Not really." When further asked why not, she explained that she would tell defendant that she did want to have play fights anymore. However, K.S. also noted that in high school, as she continued developing, she would feel "exposed and weird," as defendant was still asking her to participate in play fights, would put his hand down her shirt, and would "cup" her breast. As she explained, play fighting is "not something that, you know, as a developing young lady that you want to happen to you anymore."

K.S. noted that around her sophomore year of high school, defendant stopped coming into the bathroom when she was bathing. However, she testified that defendant would continue to try to put his hand down her shirt and noted that on one occasion, he sat her on his lap while play fighting. She stated that it felt weird and awkward because she was developing at the time and felt as though she should not be sitting on defendant's lap. This incident occurred on the living room floor, by the couch, when no one else was home besides defendant and K.S.

Regarding the night that she woke up and saw defendant in her room masturbating, K.S. testified, "I was scared. My heart was beating, felt like I was hyperventilating." When she asked defendant what he was doing, he told her that he was just checking on her. She noted that she was nervous while around defendant after that incident. Regarding the incidents in which she woke up after feeling pressure on her vagina, K.S. described herself as a "pretty hard sleeper." She noted that she

8

does not wake up right away and that she doesn't hear every sound or see everything when she first wakes up.

Stepsisters A.F. and P.T., as well as C.B. and K.S., testified consistently regarding K.S.'s sixteenth birthday party in 2014. The party ended around 11:00 p.m., and the overnight attendees retired to the two hotel rooms. Specifically, K.S.'s parents went to their hotel room down the hall, while K.S. and her guests slept in a separate room. K.S., C.B., and two other girls (who did not testify at trial) slept in the bed nearest the room's entry/exit door, while A.F., P.T., and a seventh girl (who did not testify at trial) slept in the bed nearest the wall. K.S. testified that C.B. woke her up and told her that defendant had been in the room and touched C.B. on her shorts and that defendant started tugging and pulling C.B.'s shorts down. C.B. further told K.S. that when she looked up and asked defendant what he was doing, he told C.B. that he was just checking on her. K.S. further testified that C.B. told her that P.T. also saw defendant in the room during the night. K.S. stated that P.T. then related that defendant touched her breasts and that she felt uncomfortable. K.S. testified that she was confused as to why defendant would do such things, but noted that it made her recall past incidents of defendant touching her inappropriately. She testified that before this occasion, she did not think that defendant would also inappropriately touch one of her friends. She stated that she was "mad" because everyone was having a good time, but then everyone's mood changed due to defendant's actions. The girls told K.S. that they needed to tell T.S., K.S.'s mother, which made K.S. nervous.

Regarding her observations during the sleepover, A.F. initially only testified as to what she saw happen to the other girls. A.F. testified that she woke up at 3:00 or 4:00 a.m., when defendant opened the girls' hotel room door. Defendant came in, closed the door, and walked around to the foot of the bed where P.T. was sleeping. A.F. saw defendant put his hand in P.T.'s shirt, grab her breast, and remove his hand. According to A.F., defendant then went to the side of the room where C.B. was sleeping, and stayed on that side of the room for about five minutes before leaving the room. Later that morning, A.F. woke up when she heard the other girls talking. She noted she heard them talking about what happened and that P.T. said, "Oh my God; me, too."

9

She also heard sniffling and believed that one of the girls was crying. On cross examination, when she was questioned about her testimony in the prior proceeding and any discrepancies, A.F. testified that defendant had touched her as well, stating, "he touched up against my butt, then he went to the other side to [C.B.], then [K.S.], and he went out the room."[6]

P.T., A.F.'s stepsister, was sixteen years old at the time of the trial. P.T. testified that during the hotel sleepover for K.S.'s party, after she went to sleep, someone touched her. She stated that she did not think anything of it until it happened again and she, at that point, woke up. She noted that she was at the foot of the bed, and her sister and cousin were at the top of the same bed. She further testified that she was initially touched on her leg, then she felt something underneath her shirt, by her stomach, and then her breast. She did not see who was touching her as it occurred, but when she looked up, she saw defendant leaving the room. At that time, everyone else was in bed, so P.T. assumed that it was defendant who had touched her.

C.B. was twenty years old at the time of the trial, and her date of birth is May 12, 1998. C.B. went to school with K.S. and had known her since the sixth grade. C.B. testified that on the night of K.S.'s birthday sleepover, she woke up when she heard the door opening and footsteps as someone entered the hotel room. She further testified that it was defendant who came in, that he was on one side of the room, and he then came to her side of the bed. C.B. stated that defendant adjusted the cover, raised the cover, put his hand underneath the cover, and put his hand on her thigh. She stated that it felt like he was trying to get his hand underneath her shorts, but she woke up, opened her eyes, and realized that he was standing there. C.B. stated that she was in shock and defendant told her, "Oh, baby, I'm sorry; I'm just checking on you." He put the cover back down and walked out of the room. She noted that she was in the bed closest to the door, and she did not see what defendant was doing on the other side of the room.

---

[6] On redirect examination, A.F. confirmed that she initially left out the part about defendant touching her, as she was instructed to do so based on the trial court's pretrial ruling, later referenced herein in the discussion of assignment of error number one.

10

When the girls went downstairs for breakfast, they talked to T.S. about what happened during the night. As K.S. further testified, A.F. and P.T. showed them a text message that A.F. had sent to P.T., detailing what once occurred when A.F. spent the night with K.S. at her house. K.S. confirmed that she read the text message and that it provided details regarding acts by defendant that A.F. had observed while K.S. was sleeping. Regarding their reaction to the text message, K.S. stated that "everybody was pretty shocked." K.S. further stated that she was a little embarrassed by the content of the text message and noted that it described acts that she had seen before on occasions when she would wake up as defendant stood above her bed. At trial, T.S. confirmed that A.F., P.T., and C.B. informed her of defendant's actions and showed her the text message that A.F. sent to P.T.[7]

Regarding the night detailed in the text message, A.F. testified that on her last overnight stay at K.S.'s residence, defendant came into the room during the night, yanked the covers off of K.S., pulled K.S.'s legs down, and walked around to the other side of the bed. After he walked around to the side of the bed, she saw him put his hand under K.S.'s shirt. A.F. noted that K.S. appeared to be asleep. Defendant then got a bottle of lotion. A.F. heard defendant squirt some lotion onto his hands just before she saw his arm going back and forth. A.F. heard defendant buckle up his pants before he left the room. At some point, A.F. texted P.T. and told her what happened.

After K.S.'s birthday sleepover, the girls barely talked to each other. C.B., P.T., and A.F. were no longer allowed to spend the night at K.S.'s home. K.S. testified that she felt bad about the relationships changing and because her friends felt violated. She further stated that she felt alone in the world. About a month or so after the party, defendant was "kicked out" of the house and then returned for some time before permanently moving out. Before February of 2015, specifically at the end of 2014, according to T.S.'s trial testimony, K.S. revealed some of the allegations to her mother, including incidents of inappropriate touching while "play wrestling." According to K.S., she did not reveal everything because she was still nervous and embarrassed at the time. On February 23, 2015, Detective Leigh Rice of the East Baton Rouge Parish

---

[7] A.F. last spent the night at K.S.'s house roughly a few months to a year before the party.

11

Sheriff's Office briefly interviewed K.S. before transporting her to the CAC and conducting a more extensive interview. However, K.S. did not disclose any allegations of sexual abuse. As K.S. testified, at the time of the initial CAC interview, she was still nervous, embarrassed, and had not yet told her mother everything.

When her mother and defendant permanently separated, and as they were in the process of reaching a divorce and visitation agreement, K.S. decided to disclose additional allegations of abuse by defendant to her mother and discussed some of the details with her biological father. Moreover, on March 28, 2015, K.S. provided a handwritten statement to the police detailing incidents of abuse by defendant. In the written statement, K.S. detailed the allegation of digital penetration, specifically indicating that she was twelve years old when it occurred during one of the "play wrestling" incidents with defendant. Consistent with her trial testimony, K.S. wrote that defendant told her that he was preparing her "in case somebody tried to rape or touch" her inappropriately. As she further wrote, "I struggled to get him off and that's when he pulled my pants down and stuck his finger inside of my vagina and I screamed and started to cry." Her handwritten descriptions of the incidents of waking up in the middle of the night to find defendant in her bedroom, during which she experienced vaginal pain, and on one occasion saw defendant masturbating in her bedroom, were also consistent with her trial testimony. She specifically indicated that defendant told her that he was "just checking" on her during these incidents.

On April 3, 2015, K.S. was examined by Dr. Murrill. Dr. Murrill testified that the scar on K.S's. hymen indicated that it had been torn sometime in the past. He concluded that the tear did not occur recently, as a recent injury would have consisted of a hematoma formed at the edges of the injury and acute bleeding. Dr. Murrill confirmed that it was impossible to know when in the past the tear occurred, but he was certain that it was not recent. During cross-examination, he testified that it was not reasonable to think that K.S. could have injured herself through masturbation. Dr. Murrill further testified that it was possible, but not probable, that a person could experience a tearing of the hymen without feeling pain, noting that a hymen is virginal tissue, and when it tears, it causes pain and bleeding. Dr. Murrill confirmed that a low

level of pain was possible, but that experiencing no pain at all was not a possibility when a female's hymen is torn for the first time. He confirmed that something would have to penetrate the hymen to cause the tear. On redirect, Dr. Murrill testified that any tear to the hymen had to be caused by penetration.

After the medical examination by Dr. Murrill, Detective Rice interviewed more witnesses, including C.B.'s mother, and K.S. participated in a second CAC interview. During the second CAC interview, K.S. made disclosures consistent with her written statement. After acquiring documentation of K.S.'s medical examination, K.S.'s handwritten statement, and the second CAC interview, Detective Rice obtained a warrant for defendant's arrest.

On appeal, defendant contends that it was unreasonable for the jury to believe K.S.'s testimony. Thus, defendant's argument raises an issue of K.S.'s credibility. However, the jury heard all of the testimony and chose to accept the victim's account. In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Higgins**, 03-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

Defendant suggests that there is no physical evidence to support K.S.'s claim of sexual abuse, but the testimony of the victim alone is sufficient to prove the elements of the offense. See **McKinney**, 194 So.3d at 705; **State v. Orgeron**, 512 So.2d 467, 469 (La.App. 1 Cir. 1987), writ denied, 519 So.2d 113 (La. 1988). The jury's verdict reflects a reasonable conclusion that, based on the testimony of K.S., she was sexually abused by defendant. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. See **State v. Calloway**, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). K.S. was subjected to rigorous cross-examination. The jury heard all of the testimony, found K.S. to be credible, and rejected defendant's theory of innocence. We cannot say that the jury's determination was irrational under the facts and circumstances presented to it. See **Ordodi**, 946 So.2d at 662.

13

Viewing the evidence in the light most favorable to the State, we are convinced that any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant, by virtue of his position of control and supervision as K.S.'s stepfather, repeatedly subjected K.S. to inappropriate touching of a sexual nature and to digital penetration while she was under the age of seventeen. Thus, after a thorough review of the record, we find that the evidence supports the jury's verdict finding defendant guilty of molestation of a juvenile. Accordingly, we find that assignment of error number two lacks merit.

## ADMISSION OF OTHER CRIMES/PREJUDICIAL EVIDENCE

In assignment of error number one, defendant argues that the "biased" testimony of the three girls who attended K.S.'s slumber party in January 2014 tainted the legitimacy of the jury's verdict. He contends that the testimony prejudiced the jury against him and that their statements were unsubstantiated. Defendant claims that the girls did not immediately tell their parents about their allegations and that their parents did not contact the police. He argues that "such testimony from minor children is destined to cause a rational juror to be distracted by their sympathy for these girls, not by the veracity of their statements." Defendant further challenges the admissibility of K.S.'s testimony regarding the following three allegations: (1) defendant masturbating in K.S.'s bedroom; (2) defendant talking to K.S. at length while she was naked in the bathtub; and (3) defendant telling K.S. to trim her pubic hairs after drawing attention to her body in front of her family while on vacation. Defendant argues that these incidents constitute randomly selected episodes of bad behavior designed to depict him as a person of bad character and to convince the jury to support K.S.'s "baseless allegations." Thus, defendant requests this court to vacate and set aside his conviction and sentence due to the trial court's decision to permit the State to use "prejudicial and inflammatory" evidence to support its claim of guilt against him.

Prior to the initial trial, the State filed notice and a supplemental notice of its intent to introduce evidence of other crimes, bad acts, or wrongs, pursuant to LSA-C.E. art. 412.2. After a hearing on the motion, the trial court ruled that such evidence was

14

admissible at trial.[8] As detailed in addressing assignment of error number two, three other witnesses, A.F., C.B., and P.T., along with the victim in the instant matter, testified at trial regarding similar acts.

We note initially that it is not necessary, for purposes of Article 412.2 testimony, for defendant to have been charged, prosecuted, or convicted of the "other acts" described. See **State v. Layton**, 14-1910 (La. 3/17/15), 168 So.3d 358, 362; **State v. Mischler**, 18-1352 (La.App. 1 Cir. 5/31/19), ___ So.3d ___, ___ , 2019 WL 2334219, at *9. Article 412.2 was a legislative response to earlier decisions from the Louisiana Supreme Court refusing to recognize a "lustful disposition" exception to the prohibition of other crimes evidence under LSA-C.E. art. 404. **State v. Buckenberger**, 07-1422 (La.App. 1 Cir. 2/8/08), 984 So.2d 751, 757, writ denied, 08-0877 (La. 11/21/08), 996 So.2d 1104. Louisiana Code of Evidence article 412.2 provides:

> A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
>
> B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
>
> C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.

In order for any evidence deemed to fall within Article 412.2 to be admissible, it must pass the balancing test of LSA-C.E. art. 403, which provides: "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Ultimately, questions of relevancy and admissibility of evidence are discretion calls for the trial court. Such determinations

---

[8] Due to an omission in the State's pretrial notification, the trial court found inadmissible testimony by A.F. regarding defendant inappropriately touching her personally on the night of the party. As previously noted in addressing assignment of error number two, as a result of the trial court's pretrial ruling, the State instructed A.F. to omit such testimony during direct examination. However, during cross-examination, the trial court reversed its ruling, finding that the defense "opened the door" to the subject matter.

regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. **State v. Mosby**, 595 So.2d 1135, 1139 (La. 1992); **State v. Friday**, 10-2309 (La.App. 1 Cir. 6/17/11), 73 So.3d 913, 925, writ denied, 11-1456 (La. 4/20/12), 85 So.3d 1258.

In this matter, we find no abuse of discretion in the trial court's ruling allowing K.S.'s testimony at issue and the testimony of the other three girls at trial. The testimony at issue was highly probative and tended to show defendant's lustful disposition toward young girls. At trial, the girls gave consistent accounts as to their observations of defendant entering their hotel room on the night in question, not only as to what happened to them individually, but also evidence of as to the fact that defendant stopped at both beds before leaving the room. While the trial took place years later, the girls told T.S. about the incident that very morning. Further, as to any temporal requirement regarding the admissibility of LSA-C.E. art. 412.2 evidence, remoteness in time is generally only one factor to be considered when determining whether the probative value of other acts evidence outweighs its prejudicial effect. See **State v. Wallace**, 15-1219 (La.App. 1 Cir. 12/23/15), 185 So.3d 795, 806, writ denied, 16-0432 (La. 6/3/16), 192 So.3d 755. At trial, the trial court specifically instructed the jury that defendant was on trial only for the offense charged, and the evidence of other crimes could be considered only for a limited purpose.

We note that the accounts of the three girls, which were also consistent with the victim's experiences, were extremely similar. We find the evidence of other behavior, including the inappropriate touching of young girls on the private areas of their bodies and masturbating in the presence of young girls, was highly relevant and probative to show defendant's propensity for sexual activity with young females related to him or under his care. See **State v. Robertson**, 51,521 (La.App. 2 Cir. 8/16/17), 243 So.3d 1196, 1203-04. Defendant exhibited a pattern of behavior made manifest by the continuity and consistency with which the other acts were committed. His predilection to pedophilic activities appears long standing and firmly entrenched. See **State v. Driggers**, 554 So.2d 720, 727 (La.App. 2 Cir. 1989). Accordingly, the probative value of the evidence at issue was not outweighed by the danger of unfair prejudice under

16

Article 403.  See **State v. Cole**, 19-0033 (La.App. 1 Cir. 9/27/19), 288 So.3d 146, 155.

Assignment of error number one is without merit.

## CONCLUSION

Considering the above, we affirm defendant's conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED.**