## NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2023 KA 0782

STATE OF LOUISIANA

VERSUS

DIONTE BRACKEN

**Judgment Rendered: FEB 2 3 2024**

\* \* \* \* \* \*

Appealed from the
Eighteenth Judicial District Court
In and for the Parish of Iberville
State of Louisiana
Docket Number 783-20
The Honorable Alvin Batiste, Jr., Judge Presiding

\* \* \* \* \* \*

Antonio M. "Tony" Clayton
District Attorney
Terri Russo Lacy
Assistant District Attorney
Port Allen, Louisiana

Counsel for Appellee
State of Louisiana

Jane L. Beebe
Addis, Louisiana

Counsel for Defendant/Appellant
Dionte Bracken

Dionte Bracken
Angola, Louisiana

In Proper Person

\* \* \* \* \* \*

BEFORE: GUIDRY, C.J., CHUTZ, AND LANIER, JJ.

Chutz, J. Dissents with Reasons

**GUIDRY, C.J.**

The defendant, Dionte Bracken, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1, and one count of attempted second degree murder, a violation of La. R.S. 14:27 & 14:30.1. He pled not guilty and, following a trial by jury, was found guilty as charged on both counts. The defendant was sentenced to life in prison without the benefit of parole, probation, or suspension of sentence for second degree murder, and to a concurrent sentence of fifty years without the benefit of parole, probation, or suspension of sentence for attempted second degree murder. The defendant now appeals, designating three assignments of error in a pro se brief and one assignment of error in a counseled brief. For the following reasons, we reverse the defendant's convictions and sentences and remand for a new trial.

## FACTS

On the night of August 19, 2020, Deandre Brown and his girlfriend, Jaion Knight, were sitting in Brown's parked vehicle in Knight's grandmother's driveway at 56630 Corporal Herman Brown in Bayou Goula, Louisiana. While Brown and Knight were talking, someone approached the vehicle, opened the driver's side door, and fired one bullet into the car. The gunman then fired three or four more shots before fleeing the area on foot. None of the bullets struck Brown, however Knight suffered gunshot wounds to her leg and arm, and a fatal gunshot wound to the head. Brown identified the gunman as the defendant, Dionte Bracken, whom he had known for several years and from whom he had recently received threatening messages. The defendant was later charged with the second degree murder of Jaion Knight and the attempted second degree murder of Deandre Brown.

2

## SUFFICIENCY OF THE EVIDENCE

In his third pro se assignment of error, the defendant contends that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of the offenses charged.[1]

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV, § 1; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime and the defendant's identity as the perpetrator of the crime beyond a reasonable doubt. See La. C.Cr.P. art. 821(B); Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Currie, 20-0467 (La. App. 1st Cir. 2/22/21), 321 So. 3d 978, 982.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Currie, 321 So. 3d at 982. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Dyson, 16-1571 (La. App. 1st

---

[1] When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So. 2d 731, 734 (La. 1992); State v. Duhon, 18-0593 (La. App. 1st Cir. 12/28/18), 270 So. 3d 597, 609, writ denied, 19-0124 (La. 5/28/19), 273 So. 3d 315.

Cir. 6/2/17), 222 So. 3d 220, 228, writ denied, 17-1399 (La. 6/15/18), 257 So. 3d 685.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). To sustain a conviction for attempted second degree murder, the State must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on specific intent to kill *or* to inflict great bodily harm, attempted second degree murder requires specific intent to kill. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); State v. Bishop, 01-2548 (La. 1/14/03), 835 So. 2d 434, 437.

The State bears the burden of proving the elements of the offense, along with the burden of proving the identity of the defendant as the perpetrator. When, as in this case, the key issue is the perpetrator's identity, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. State v. Coleman, 17-1045 (La. App. 1st Cir. 4/13/18), 249 So. 3d 872, 877-78, writ denied, 18-0830 (La. 2/18/19), 263 So. 3d 1155.

At trial, the State provided overwhelming evidence of the defendant's identity as the perpetrator of the instant offenses, including Brown's positive identification of the defendant as the person who shot at him and who killed Knight. Brown testified at trial that a few days prior to the shooting, the defendant contacted Knight via Snapchat. Brown, who was in a romantic relationship with Knight, responded to the defendant in an escalating exchange that ended with the defendant asking Brown where he was and Brown responding that he would be returning from Houston shortly. Two days later, on the evening of August 19, 2020, Brown and Knight were

4

sitting in Brown's vehicle, a distinctive lime green Dodge Charger, that was parked in Knight's grandmother's driveway in Bayou Goula. Brown testified that the driver's side door was suddenly flung open by the defendant, who was dressed in all black and stated "you thought this sh** was dead," before firing his gun into the vehicle.

Brown then checked on Knight, who was unharmed at this point, before exiting the vehicle and running after the defendant. Brown testified that he slipped and fell down in front of his vehicle, at which point the defendant fired three or four more shots in Brown's direction before fleeing. At that point, Brown realized that Knight was laying on the ground near the vehicle's passenger side door and had been shot. Brown further testified that he and the defendant had known each other since the eighth grade, and prior to this incident, he believed that they were friends. Brown stated that the defendant was not wearing a mask, that he looked him in the eyes and recognized him immediately, and that he was one hundred percent certain that the defendant was the shooter.

Dr. Michael Defatta, the chief forensic pathologist with the St. Tammany Parish Coroner's Office, testified regarding Knight's autopsy. The autopsy showed that Knight suffered three gunshot wounds, one to her left cheek, one to her left calf, and one to the back of her left arm. Dr. Defatta testified that her cause of death was a cranial cerebral gunshot wound and the manner of death was homicide.

Amaya Meads, the defendant's girlfriend at the time of the shooting, testified that she and the defendant were in Bayou Goula on the night of August 19, 2020. Meads testified that she and the defendant drove to Bayou Goula to get his laptop from his grandmother's house on Corporal Herman Brown. After the defendant retrieved his computer, he returned to the vehicle and started to drive away. However, when he reached the end of the street the defendant said that he was going to "catch somebody slipping" before turning the vehicle around and parking in an

abandoned lot. The defendant, who was wearing pink running shorts and a black t-shirt with colorful lettering, then turned his t-shirt inside out and changed into a pair of black shorts before putting his gun in his pocket and exiting the vehicle. Meads testified that when the defendant returned to the vehicle he was short of breath, as if he had been running. He then got into the passenger seat, and Meads drove away.

Meads testified that the defendant told her to take the long way back to Thibodaux, through Plaquemine, and that when she was passing the Geismar exit on I-10, the defendant got into the back of the vehicle and threw a gun out the window. Meads continued to ask the defendant what happened, to which he eventually responded that he thought he shot "his b****." Upon returning to Thibodaux, Meads put her clothing, as well as the defendant's pink shorts and black t-shirt, into a plastic bag, which she then gave to a friend to throw away. Meads was later indicted for accessory after the fact.

Fre'nesha Owens, Meads's friend, testified that Meads called her on the night of August 19, 2020, and told her that the defendant had just left their vehicle and was about to go do something to somebody. Owens told Meads that she needed to leave, at which point Meads got into the driver's seat to drive away. However, the defendant returned to the vehicle shortly thereafter. Owens further testified that after Meads returned from Bayou Goula, Meads went to Owens's house. Owens and her friend Tijalea Brooks then left Owens's house and threw into a dumpster the plastic bag containing Meads's and the defendant's clothing. Both Owens and Brooks were indicted for accessory after the fact.

Officers with the Iberville Parish Sheriff's Office responded to the scene on 56630 Corporal Herman Brown after one of Knight's relatives called 911. Once there, several pieces of evidence linking the defendant to the crime were collected. Officers retrieved three 9 mm spent shell casings, one live 9 mm projectile, and one 9 mm bullet lodged in Brown's vehicle. Officers also canvassed the neighborhood and

located a surveillance camera on a nearby home, which, from a distance, captured the shooting. The video is too dark and the incident too far away to show exactly what happened. However, it is evident in the video that a car door is opened, after which an individual ran toward the street and then fell down. Moreover, several flashes can be seen in the video which are consistent with gunshots.

A black 9 mm handgun was found in the median between the east and westbound lanes of I-10, near Prairieville, the area identified by Meads as where the defendant threw the gun out of the vehicle. Ballistics testing indicated that the casings recovered from the scene were fired from the recovered 9 mm handgun. Ballistics testing also found that the two bullets recovered from the scene had the same class characteristics and could have been fired from the firearm, although they were too damaged to make an identification to that particular firearm. Additionally, testing concluded that the live round from the scene was cycled through the same handgun. Moreover, a DNA profile obtained from the handgun was consistent with the sample DNA profile submitted by the defendant, and the defendant could not be excluded as a contributor.

Detective Jeremy Sanchez testified that he obtained search warrants for the defendant's cellphone records and Instagram account. A photo obtained from the defendant's Instagram account posted a few days prior to the shooting showed the defendant in pink running shorts and a black t-shirt, the same outfit worn prior to the shooting.[2] The photo also showed the defendant with a black handgun resting on his leg that closely resembled the handgun recovered in this case. Finally, the defendant's cellphone records indicated that on August 19, 2020, he traveled from Thibodaux to the Plaquemine area and was in the vicinity of 56630 Corporal Herman Brown when the shooting occurred. The cellphone records then show the defendant

---

[2] The caption of the photo includes the phrase "If I Can't Catchu Slippen (sic) ... Take Someone You Close To + Ian (sic) Sparing Hoes Cuz (sic) Y'all B****** Do The Most Too".

traveling through Ascension Parish along I-10 in the same area where the 9 mm gun was later recovered.

On appeal, the defendant argues that his conviction was based on the unreliable testimony of Meads, Owens, and Brooks, each of whom was indicted as an accessory after the fact in this case. However, the verdicts rendered in this case indicate that the jury found these witnesses credible and rejected the defendant's hypothesis of innocence. We cannot say that they were unreasonable in doing so.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Alexander, 14-1619 (La. App. 1st Cir. 9/18/15), 182 So. 3d 126, 131, writ denied, 15-1912 (La. 1/25/16), 185 So. 3d 748. Accordingly, on appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Lavy, 13-1025 (La. App. 1st Cir. 3/11/14), 142 So. 3d 1000, 1006, writ denied, 14-0644 (La. 10/31/14), 152 So. 3d 150.

The State presented overwhelming evidence of the crimes committed herein, as well as the defendant's identity as the perpetrator. Deandre Brown, the victim of the attempted second degree murder, knew the defendant for years and was able to immediately identify him as the gunman, including the clothing he had on. Brown testified that the defendant fired one shot into the vehicle in which he and Knight were sitting. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Henderson, 99-1945 (La. App. 1st Cir. 6/23/00), 762 So. 2d 747, 751, writ denied, 00-2223 (La. 6/15/01), 793 So. 2d 1235.

8

Accordingly, Brown's testimony alone would have been sufficient to establish the elements of attempted second degree murder.

Meads corroborated Brown's testimony regarding the defendant's clothing, as well as his location in Bayou Goula on the night of August 19, 2020, the fact that he was carrying a gun, his behavior before and after the shooting occurred, and that he later threw the gun out of the vehicle window onto the highway median where it was recovered. Meads, while having been indicted on accessory after the fact, testified that she was not promised leniency by the State for her testimony. Moreover, her testimony did not stand alone but rather was corroborated by the defendant's phone records and Instagram posts, as well as DNA and ballistics evidence.

The defendant's cellphone records showed him in the area where the shooting took place at the time the shooting occurred. His phone records then showed the defendant traveling back to Thibodaux along the interstate, including the area in which his gun was recovered. The defendant's Instagram photo showed him holding a gun and wearing the same clothing later recovered in this case. Furthermore, the caption to the Instagram post could reasonably have been interpreted by the jury as a threat made towards Knight, Brown's girlfriend. Finally, the State submitted uncontroverted evidence that the defendant's DNA was found on the recovered gun, and also ballistics evidence that the casings recovered from the scene were from the same gun.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Calloway, 07-2306 (La. 1/21/09), 1 So. 3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of second degree murder and attempted second

9

degree murder, and the defendant's identity as the perpetrator of those offenses. This assignment of error is without merit.

## RIGHT TO FAIR AND IMPARTIAL JURY

In his first and second pro se assignments of error, the defendant contends that he was denied his constitutional right to a fair and impartial jury when a juror informed the trial court that she could not continue deliberating and refused to be sequestered, after which the trial court gave the jury an improper Allen[3] charge.

While we note that the defendant in this case failed to make a contemporaneous objection to the jury charge, if an alleged error is so significant that it violates a fundamental right, then to preserve the requirements of due process, the error is reviewable on appeal even absent a contemporaneous objection. State v. Thompkins, 18-1032 (La. App. 1st Cir. 2/27/19), 273 So. 3d 346, 350 n.4, writ denied, 19-00666 (La. 9/17/19), 278 So. 3d 973. As the Louisiana Supreme Court has noted, La. C.Cr.P. art. 808 contemplates additional instructions once jury deliberations have begun with only two major limitations. These are that the judge may not comment on the facts nor may the judge attempt to coerce the jurors into agreeing on the verdict. State v. Schamburge, 344 So. 2d 997, 1001 (La. 1977). Louisiana courts have previously made exceptions to the contemporaneous objection rule with respect to a jury charge. See State v. Williamson, 389 So. 2d 1328, 1331 (La. 1980) (erroneous instructions with respect to the elements of the offense, which were not objected to, were of such importance and significance as to violate fundamental requirements of due process); State v. Green, 493 So. 2d 588, 590 (La. 1986) (failure of trial court to give a limiting instruction in a recidivist statute prosecution, while not objected to, reached the level of due process considerations); cf. State v. Caston, 561 So. 2d 941, 943 (La. App. 2d Cir. 1990) (Allen charge was not coercive in its total

---

[3] Allen v. U.S., 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

context, so failure to lodge a contemporaneous objection precluded appellate consideration). Finding that the error alleged herein speaks directly to the requirements of due process and the alleged violation of a fundamental right, we find these errors reviewable absent a contemporaneous objection. See State v. Williams, 17-0585 (La. App. 1st Cir. 11/16/17), 236 So. 3d 604, 607.

In the instant case, after the State and defense delivered closing arguments and the trial court instructed the jury, the court then released the sole alternate juror, and at 7:22 p.m. the jury retired to deliberate. At 8:08 p.m., the jury submitted its first question, which in part asked for clarification regarding hung juries. The trial court answered by stating: "A hung jury, in Louisiana, it requires a unanimous verdict. So all 12 of you would have to vote either guilty or not guilty. If there's a hung jury, that means that we have to come back to try this case again before another jury."

The following exchange then took place between the jury foreperson and the trial court:

FOREPERSON: I think that we had some very technical questions regarding definitions of things, like when we asked: What is a hung jury? Does that mean we have decided not to agree? How many people have to disagree? How long does it have to take for us to disagree? That was one component of: What is a hung jury.

The second component of that question was: Then what were the implications regarding, I guess, the defendant and his custody? Where – what happens to him? What does he get to do if that is a decision made by the jury?[4]

COURT: Okay. And, again, in order to reach a verdict in this case, all 12 of you have to agree. So it has to be all 12 of you would have to agree either to the original charge, to one of the responsive verdicts to the original charge, or not guilty. It takes all 12 votes.

And if you don't or cannot agree to a unanimous verdict, then we'll have to try this case again, and we'll have to

---

[4] In response to this question, the trial court instructed the jury that their decision would not have any impact or effect on the defendant's status, so their decision needed to be made independent of that consideration.

11

bring in a whole other jury in order to do that. You all would be discharged from further jury service on this particular case.

How long does it take you to make that decision? I know you hadn't been back there that long yet. I don't want to put you all in a position where you feel like you have to stay there all night in order to do that because you don't. I don't know if it would help if maybe you all got to go home this evening and then come back in the morning to try and do your deliberations. But I would say, you know, to a point where you've discussed the case among yourselves and then, after discussing the case, each juror being able to express their opinion and reasons why they have that opinion, if after that, the majority can't change the minorities' opinion or decision, then I would say you all have a hung jury and you can just report that back to the court.

**FOREPERSON:** Your honor, would it be without reason for us to have a conversation, if we wish, to go home and cool off or continue to discuss privately as opposed to in front –

The trial court then asked counsel to approach, where it was discussed that once deliberations began, the jury would have to be sequestered until they reached a decision.[5] The following exchange then took place:

**COURT:** I'm being told now we'll do some research to find out – I guess because you're at this point now, if you all wanted – if you can't reach a verdict tonight, it may be necessary for us to house you until tomorrow in order for you to make a decision, but we're checking on that right now to make certain that is correct.

**JUROR NO. 57:** Excuse me. I can't be housed. I have a special needs child. And I do know – we've been here nearly 12 hours now, and – I'm sorry. I've got my husband keeping her. She's severely autistic.

And I'm – I'm sure a lot of you already know – and I can't be put in a hotel tonight. I've got to get home to my child. I mean, I'm sorry. But that is – you know, my husband's keeping her right now but, you know, I can't – she's on medication twice a day. She's severely autistic. She has plenty behavioral issues, and I'm pushing it staying this late.

---

[5] In 2022, at the time of the defendant's trial, La. C.Cr.P. art. 791(C) stated that in noncapital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court. This article was subsequently amended in 2023 to allow a trial court to suspend deliberations and separate the jury without sequestration. See La. C.Cr.P. art. 791(C)(3) (as amended by Acts 2023, No. 75, § 1).

When we took it over, y'all had said "till 5:00." And I'm okay with 5:00, even okay with going home right now, but I can't stay much longer. I'm sorry. My brain really can't take anymore of this. I really can't. I'm sorry. That's just – that's how I feel.

Thereafter, at 8:27 p.m., the jury resumed deliberations. A few hours later, the jury sent another question asking whether a juror could be released once the jury had her vote. While the parties discussed the appropriate response, the State offered the following:

STATE: Judge, we agree to ask – that she be instructed that the people deserve a verdict – we'll talk to all of them, bring them in – and that you're to not do any damage to your conscience but to deliberate this case, and that's it. And then, after that, if they don't want to do that, then we'll hold up and see what we're going to do, but I just want to **Allen** charge them one time.

COURT: Okay. Well, I'll recharge them with the same verdicts as before.

STATE: Thank you.

COURT: Because I looked at the case law. The Allen charge is banned.

STATE: Not good.

COURT: It's banned.

The court then instructed the jury as follows:

COURT: Ladies and gentlemen, I basically wanted to reiterate to you what your duty is as jurors in this case. And I do believe that at the time . . . even though I advised that the normal hours of court would be 9:00 to 5:00, I also stated that once the case was given to the jury, that we would remain here until a verdict was rendered. So I know that it's late. I know that y'all have been here for some time, but I think you need to recognize the importance of this matter, not only to the State as well as the defendant, but also to this community and the parish of Iberville to do your job.

And, again, you're not advocates for either side. Your duty is to listen to the evidence and, as best you can[,] to try and reach a verdict after discussing the case among yourselves with each other, and if you're convinced that

13

your decision may not be correct after listening to your other jurors, don't hesitate to change your opinion; but if you're convinced that you're right, then maintain that opinion. And if you can't reach a verdict, it's perfectly fine if you come back and tell me, "We can't reach a verdict," but we need to stay here until we know one way or another, either that you have a verdict or you don't have a verdict. So I can't let anyone leave. This has to be done by all 12 jurors. Until you all can reach a decision or you decide you can't reach a decision, you have to continue to hopefully try and reach some type of decision in this case. So we'll excuse you all again and just let us know when you're ready.

At 10:47 p.m. the jury again went back to continue deliberations. At 11:25 p.m., the jury returned with a unanimous verdict of guilty as charged on both counts. On appeal, the defendant contends that he was deprived of the right to a fair and impartial jury when Juror No. 57 refused to be sequestered after the jury was deadlocked, and the trial court gave the jury an improper Allen charge in order to force a verdict.

An Allen charge is an instruction acknowledged to be calculated to dynamite jury deadlocks and achieve jury unanimity. State v. Mitchell, 17-0431 (La. App. 1st Cir. 9/21/17), 232 So. 3d 60, 67, writ denied, 17-1928 (La. 6/15/18), 257 So. 3d 686. Such a charge, and any coercive modification thereof, is banned in the courts of Louisiana. An Allen charge emphasizes that the jury has a duty to decide the matter at hand, which implies that the trial judge will not accept a mistrial in that case. Additionally, when the duty to reach a verdict is coupled with the trial court's admonition that those in the minority shall reconsider their position, there exists an almost overwhelming pressure to conform to the majority's view. Id. Therefore, if a trial judge gives an Allen charge, or any "coercive modification" of same, the trial court will have committed reversible error. See State v. Nicholson, 315 So. 2d 639, 641 (La. 1975); State v. Lavigne, 22-282 (La. App. 5th Cir. 5/24/23), 365 So. 3d 919, 951.

14

*Duty to Reach a Verdict*

In Nicholson, the Louisiana Supreme Court found that the trial court's use of a modified Allen charge mandated reversal of the defendant's conviction and sentence. There, the court focused on the fact that the trial court's Allen charge "unmistakably indicat[ed] to the lay jury that if the case were to end in a mistrial it would definitely have to be tried again." The court found that these instructions were misleading, in that they conveyed to the deadlocked jury the impression that their inability to reach a verdict would absolutely ensure the expenditure of time and money necessitated by a complete retrial. Accordingly, the court found that the implications of the misleading charge presented a substantial risk that a juror or jurors possessed of a genuine conviction that reasonable doubt existed would be coerced into agreement with a majority voting to render a guilty verdict. Nicholson, 315 So. 2d at 641-42.

We find the same concerns noted in Nicholson present, and indeed amplified, in the Allen charge used in the case herein. Where Nicholson noted the potentially misleading instruction that a mistrial *could* require the case to be tried again, the instruction given in the instant case stated unequivocally that a hung jury would require a second trial.[6] As the court explained in Nicholson, this instruction ignores plausible alternative outcomes including that the defendant could be offered a plea deal, or that the State could conclude that it does not have evidence sufficient to justify another trial, and decide to dismiss the charges altogether. Id. at 642. This misleading instruction is particularly troubling in light of the jury's question regarding the defendant's status should the jury remain deadlocked. The

---

[6] The trial court stated, at various points: "If there's a hung jury, that means that we have to come back to try this case again before another jury"; and "[I]f you don't or cannot agree to a unanimous verdict, then we'll have to try this case again, and we'll have to bring in a whole other jury in order to do that."

15

jury was clearly concerned with what would happen next, and the trial court's instruction failed to account for any possibility other than a full re-trial.

Furthermore, while the trial court did state that it could accept a mistrial, the trial court also repeatedly advised the jury of the importance of unanimity, even at one point implying that a unanimous agreement was required to reach a hung jury.[7] Moreover, the jury did inform the trial court at various points over the course of four hours that it did not have a unanimous vote, and the trial court nevertheless instructed the jury to continue deliberations. Accordingly, while the instruction given stated a mistrial was an acceptable result, the reality is that the trial court did not accept that the jury could not reach a unanimous decision.

Finally, before the jury was ordered to continue deliberations for the final time, the trial court instructed the jury that they needed to "recognize the importance of this matter, not only to the State as well as the defendant, but also to this community and to the parish of Iberville to do your job." Implicit in this instruction is that remaining deadlocked, and thus failing to deliver a unanimous verdict, was a dereliction of the jury's sworn duty. A charge which emphasizes the jury's duty to reach a verdict, thus implying that the trial judge would not accept a mistrial, is the very type of charge that the Louisiana Supreme Court has banned. See Nicholson, 315 So. 2d at 642 ("[T]he general principles which govern jury deliberations are undermined and weakened when an 'Allen charge' is given in response to notice that the jury has failed to reach a verdict and considers itself deadlocked. Each time a general principle applicable to deliberations is stated, it is modified by a remark apparently calculated to render the desirability of reaching a verdict foremost in the jurors' minds.").

---

[7] "A hung jury, in Louisiana, it requires a unanimous verdict. So all 12 of you would have to vote either guilty or not guilty."

*Coercion to Conform to Majority Viewpoint*

The court in Nicholson also noted the trial court, in the course of giving its instruction, admonished the jurors that if a majority favor conviction, the minority should consider whether their doubts are reasonable, and if a majority or a lesser number favor acquittal, the other jurors should ask themselves whether they do not have a reason to doubt the correctness of a judgment not concurred in by their fellow jurors. Id. The court found that such an effort to secure a verdict could coerce a single juror into surrendering his conscientiously held views, thus invading the province of the jury. Id.

Herein, the trial court instructed the jury that if "the majority can't change the minorities' opinion or decision," then you all have a hung jury. This is precisely what was warned of in Nicholson, in that the trial court instructed the jurors in the majority to attempt to change the vote held by the minority, and unduly pressured the juror or jurors in the minority to conform to the majority viewpoint.

The coercive effect of the trial court's instructions was further compounded by one juror's obvious distress over the trial court's announcement that the jury would be sequestered if it could not reach a verdict. Juror No. 57 was clearly distraught, explaining to the court that she had a special needs child who was severely autistic, and that she had to go home and could not be sequestered. Juror No. 57 went on to state: "I can't stay much longer. I'm sorry. My brain can't really take any more of this. I really can't. I'm sorry." The jury subsequently submitted a question as to whether one juror, presumably Juror No. 57, could be excused once they had her vote. This question further evidenced both the jury's inability to reach a verdict and at least one juror's duress during the ongoing deliberation process. In response to the jury's final question, the trial court stated that "we need to stay here until we know one way or another, either you have a verdict or you don't have a

verdict. So I can't let anyone leave. This has to be done by all 12 jurors." The clear implication of this instruction was that deliberation would continue until a unanimous decision was made.

Setting the issue of the jury charge itself aside for a moment, we note that the given charge did not occur in isolation and should be considered within the entire context of the record. The record in this case shows that the totality of events that occurred during the jury's deliberation created an unnecessarily coercive deliberative process. Initially, we note that only one alternate juror was selected during voir dire. After twelve jurors and one alternate were selected, the State asked the trial court whether it would like to voir dire another panel to select an additional alternate juror, to which the trial court replied, "No. We've had these people here long enough." Thereafter, once the jury was instructed but before it was retired to deliberate, the trial court excused the sole alternate juror.

The trial court could just as easily have kept the alternate juror sequestered during the course of deliberations in the event that a juror became unfit to serve before a decision was rendered. Incidentally, this is precisely what did happen with respect to Juror No. 57, who was openly distraught by both the suggestion that deliberations would have to continue, and that the failure to reach a unanimous decision would result in overnight sequestration. The jury's subsequent question as to whether a juror could leave once his or her vote was cast suggests that the urgency to reach a unanimous verdict and the distress communicated to the trial court carried into the jury room and thus tainted the deliberative process.

Given that jury deliberations in this case did not begin until after 7:00 p.m., the trial court could have recessed the case after closing arguments and began the jury instruction and deliberation process the following morning. The trial court went forward with deliberation. This circumstance manufactured a sense of

urgency upon a jury that repeatedly expressed its desire to go home and was repeatedly told that no one could leave until they reached a verdict.

Given the totality of the circumstances, including the jury's repeated requests for clarification on the definition of a hung jury, Juror No. 57's refusal to be sequestered and clear distress over the continued deliberations, the foreperson's request to be excused for the night to "cool off," the trial court's instruction that a hung jury would necessarily require a second trial, its perplexing instruction that all twelve jurors must agree to a hung jury, its recommendation that the majority attempt to change the opinions of the minority, its instruction that the jury had the duty to reach a verdict, and the trial court's decision to select only one alternate juror and to release that juror prior to deliberations, we find that the Allen charge used in this case was improper.

While the trial court indicated that a mistrial was possible if the jury could not reach a verdict, the jury expressed its inability to reach a unanimous verdict multiple times and was repeatedly instructed to continue deliberating. The clear implication of this course of action was that the jury would be forced to continue deliberating until a unanimous verdict was achieved. Given Juror No. 57's objections both to continuing to deliberate and to being sequestered, as well as the Foreperson's request for time for the jurors to "cool off," we cannot say that the juror or jurors in the minority were not pressured to conform to the majority's view. Thus, although the language of the supplemental instructions was not expressly coercive, the language clearly had a coercive effect and was therefore reversible error. See Nicholson, 315 So. 2d at 642.

## MOTION FOR MISTRIAL

In this counseled assignment of error, the defendant contends that the trial court erred in denying his motion for mistrial after a witness offered prejudicial

hearsay testimony. Finding error in the trial court's <u>Allen</u> instruction, further discussion of this assignment of error is pretermitted.

**CONVICTIONS AND SENTENCES REVERSED; REMANDED FOR NEW TRIAL.**

STATE OF LOUISIANA

VERSUS

DIONTE BRACKEN

FIRST CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

NO. 2023 KA 0782

CHUTZ, J., dissenting.

Although I agree with the majority's conclusion that the evidence was sufficient to support the defendant's convictions, I disagree with the majority's conclusion that the trial court committed reversible error in giving a prohibited *Allen*[1] charge. While the trial court's jury charges may have been imperfect, I do not believe the charges rose to the level of a prohibited *Allen* charge. In my opinion, the trial court did not indicate to the jury either by its words or actions that it would not accept a hung jury. In answering the jury's question about the definition of a hung jury, the court advised the jury it did not want the jurors to feel they had to stay there all night, so if, after discussing the case and expressing their opinions, they could not reach a verdict, they could "just report that back to the court." Subsequently, the court again advised the jury it was "perfectly fine, if you come back and tell me, 'We can't reach a verdict.'" This remark followed immediately after the trial court instructed the jury that they should discuss the case among themselves and if after listening to the others, they were convinced their opinion was incorrect, they should not hesitate to change it, but if convinced they were correct, they should maintain their opinion. Considering the jury charges in their totality, I do not believe the effect of the charges was coercive to jurors holding a minority viewpoint or so fundamentally unfair as to deprive the defendant of due process. Accordingly, I respectfully dissent from the reversal of the defendant's convictions and sentences.

---

[1] *Allen v. U.S.*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d 528 (1896).